UNITED STATES, Appellee

v.

CHARLES J. DOHERTY, Jr., Parachute Rigger,
Third Class, U. S. Navy, Appellant

5 USCMA 287, 17 CMR 287

288

No. 4884

Decided December 17, 1954

Franklin P. Gould, ESQ., Albert C. Doyle, ESQ., and CDR Earl C. Collins, USN, for Appellant.

CDR George H. Rood, USN, and CAPT Wesley C. Blake, USMC, for Appellee.

### Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was tried by general court-martial upon two charges, the first alleging sodomy (fellation), and the second specifying the commission of an indecent, lewd and lascivious act, in violation of Articles 125 and 134 respectively, Uniform Code of Military Justice, 50 USC §§ 719 and 728. At the trial, a defense motion for a finding of not guilty of the second charge was sustained by the law officer, but

**289**

the accused was held accountable for the remaining offense. The court-martial imposed a sentence of a bad-conduct discharge, forfeiture of one hundred dollars per month for six months, and confinement at hard labor for the same period. The convening authority approved the findings and the sentence, after reducing the period of the forfeitures and confinement to two months. A board of review in the office of The Judge Advocate General of the Navy affirmed, and we granted a petition for review in order that we might consider the question of whether the sentence was imposed and affirmed under limitations which impair its legality.

No question is raised as to the sufficiency of the evidence to support the finding of guilt. However, because the sentence, as it presently stands, is so entangled with mitigating facts and circumstances, a brief reference to them is required.

During the early part of 1953, a "Charity Carnival," as part of a Navy relief drive, was being conducted at the United States Naval Base at Key West, Florida. At that time, and ostensibly in connection with the carnival, tickets for a "Smoker" to be held off the base were sold by several Chief Petty Officers and other civilians to civilian, enlisted, and officer personnel at that station. While the event had no official connection with the Naval activities, many purchasers of tickets were led to believe otherwise. The accused, who was 22 years of age, purchased a ticket and he attended the "Smoker," which was held on February 9, 1953. There were between 250 and 300 persons present, including some Naval officers. As is customary in that setting, considerable beer and liquor were being consumed, and the accused claims to have arrived sober but to have become intoxicated before he participated in the sexual act. The early entertainment at the event consisted of a show in which several girls performed dances without the benefit of wearing apparel. After approximately one and one-half hours of that form of amusement, the master of ceremonies announced to the audience that if sufficient funds could be collected, a prostitute, who would per-

form in public, would appear. The money was obtained from the audience and the services of the woman were procured. When she arrived, the master of ceremonies requested that members of the audience volunteer to participate in unnatural sexual acts with her. Two volunteers preceded the accused to the stage; their performances were completed; and then, after some urging by members of the audience, the accused went to the washroom, disrobed, returned, and permitted the prostitute to perform an act of fellation upon him. His degree of intoxication at that moment is in question, but he asserts that an impulse made irresistible by liquor, urging, and sex excitement, seized him, caused him to "lose his head," and dulled his recollection of events.

In order to more clearly present the question in its important aspects, we will separate it into two parts. First, was the sentence as imposed by the court-martial influenced by matters outside of the record? Second, did the convening authority, when he approved the punitive discharge, act under a misapprehension that he must do so because of instructions from higher headquarters? We will consider the questions seriatim, and we will relate the facts relevant to each question as we discuss them.

Both questions bring into importance the contents of a letter of instructions from the Department of the Navy. captioned SECNAV INSTRUCTIONS 1620.1, dated June 5, 1953. The subject of the letter is: "Procedure for the disposition of cases of homosexuality involving Naval personnel." Because it deals principally with administrative procedure to separate homosexuals from the Naval service and because we find no suggestion that it influenced the sentence of the court-martial, we will discuss its contents more fully when we dispose of the second question.

There is no dispute concerning the fact that the accused committed an act of sodomy in the presence of a large assembly of Naval personnel and citizens of Key West. He judicially admitted his part in the public display of sex

perversion. The penalty for his crime, as provided by the Code, is as a court-martial may direct, but the Table of Maximum Punishments has limited the sentence to five years' confinement, total forfeitures of pay and allowances, and a dishonorable discharge. From the penalty imposed, it is readily ascertainable that the sentence in this case was influenced by many of the mitigating facts which we have related, and no question of importance would confront us were it not for a clemency letter submitted by all the members of the court. In a letter to the convening authority, signed by them, is found the following recommendation:

"In view of the mitigating circumstances of the case, the court unanimously recommends the accused, Charles J. Doherty, junior, parachute rigger third class, U. S. Navy, to the clemency of the reviewing authority and that the bad conduct discharge be remitted."

Defense counsel reasoned from the recommendation that the court-martial members did not impose what they believed to be an appropriate sentence. That is a deduction we are not prepared to accept.

## I

It has long been the practice in the military service for courts-martial to make recommendations of ▬▬▬ ▬ clemency to reviewing authorities. The practice is undoubtedly a carry-over from early times when the convening authorities were permitted to participate in the functions of the court-martial. But, at the present time, it is a practice which must be encouraged, as courts-martial do not have the authority to suspend the execution of a sentence or remit all or any portion of the terms they impose. They only have two methods by which they can compensate for mitigating facts and circumstances. The first is by lessening the punishment to be imposed, and the second is by recommending to reviewing authorities that action be taken to suspend or remit part of the penalties assessed. Each method serves and accomplishes a different, albeit useful, purpose; and in

this instance the accused was a beneficiary in that both methods were used. The Manual for Courts-Martial, United States, 1951, supports the court in the action taken by it, and, without more than we find in this record, it is a bit difficult to hold that a suggestion for leniency renders a sentence fatally defective. Paragraph 77a states as follows:

"Mitigating circumstances which could not be taken into consideration in determining the sentence may be the basis of a recommendation for clemency by individual members of the court. The recommendation should represent the free and voluntary expression of the individuals who join therein. It should be specific as to the amount and character of the clemency recommended and as to the reasons for the recommendation."

Here, there is no showing that the recommendation which was signed by all of the members of the court-martial was not the result of each individual's free and voluntary conclusion to solicit clemency of a character that could not be granted by the court. Were it not for the mitigating circumstances preceding the crime, it could be argued reasonably that a similar sentence, without any recommendation, would be inadequate for the crime committed. Moreover, we would be hiding our heads in the sand if we did not know that many military courts impose punitive discharges, believing them to be fair and just punishment, and yet recommend they be suspended. Particularly is that true where, as here, you have several offenders and equality of punishment is to be considered. That practice leads to uniformity and permits any deterrent effects flowing from punishment to be uninfluenced by an inadequate sentence, and yet it affords the accused one more chance. In civilian life, it is standard practice to impose a sentence and suspend its execution. While there it can be done without two agencies having to collaborate, usually a parole or probation department makes an investigation for the judge before he imposes sentence. However, such a procedure is not possible in the mili-

tary judicial sphere, but it can be closely approximated if the court sentences and the convening authority investigates. However, for that system to operate, the court must impose a bad-conduct discharge, as the severity of a sentence cannot be increased by any reviewing authority.

It is conceivable there might be some merit to the contention that this verdict and recommendation were irreconcilable if the court-martial had the power to take the action it recommended; but, of course, it did not. Furthermore, we cannot escape the possibility that we would be doing a disservice to many subsequently convicted persons if we took the view that every time a court-martial recommended leniency the legality of the sentence was rendered doubtful. Because this court-martial encouraged clemency consideration by subsequent reviewers, it does not cause us to believe that the court members failed to follow the Manual directive, which requires that they exercise their own discretion as to an appropriate sentence, and not adjudge one known to be excessive in reliance upon the mitigating action of the convening or higher authorities. Certainly, unless the record establishes something more than an attempt to get for an accused some consideration that cannot be granted by the court, we are not disposed to find irreconcilability between the sentence and the recommendation.

We have no way of ascertaining from the record the date the letter of recommendation was prepared and signed. Furthermore, we are not furnished with information as to whether it was voluntarily prepared by the court members, or solicited by defense counsel. We know, however, that the Code places a burden on defending counsel to prepare an appropriate request. Paragraph 48*j*(1) of the Manual provides:

"*Clemency petition.*—At the close of the trial or as soon thereafter as practicable, if the accused is found guilty, the defense counsel shall, in a proper case, prepare a recommendation for clemency setting forth any matters as to clemency which he desires to have considered by the members of the court or the reviewing au-

thority. He shall secure the signatures of those members of the court who have indicated their willingness to sign the recommendation, and shall submit it to the trial counsel for attachment to the record of trial. See 77*a*."

We are certain the framers of the Manual did not intend to place on defending counsel the duty to obtain a clemency recommendation and, in the event he was successful, make his success the means for impeaching an otherwise valid sentence.

It has been pressed on us that the court-martial must have considered it was bound by the provisions of the SECNAV Instructions, 1620.1, supra; and, because of the type of offense, it was required to impose a punitive discharge. There is no showing that the court members had personal knowledge of the existence of the letter, let alone its contents. But, assuming, arguendo, that all court members were familiar with its provisions, it contains no directions to them. While it declares for removal of homosexuals from the Naval service, it deals with a mixture of judicial and administrative procedures to accomplish the separation. It does not attempt to force inflexibility in the court-martial punishment field; and if it did, it would offend against the Code. If we are to assume the court members were charged with knowledge of its terms, then in the absence of evidence to the contrary, we must further assume that they interpreted it correctly. In addition, the record offers substantial support for that assumption, as the arguments by counsel on the sentence show that all parties at the trial level understood the imposition of a bad-conduct discharge was not mandatory. Throughout the trial, counsel for the accused fought principally to save his client from being discharged. He emphasized and reemphasized the facts and circumstances which he contended would justify the court in not separating the accused from the service. In rebuttal, trial counsel acknowledged that the defense had stated correctly the factors the court could consider in determining the appropri-

ateness of a sentence, including the imposition of a punitive discharge. While he asserted the accused had been convicted of a serious offense, he never contended a punitive discharge was required by the facts of the case or by Navy policy. He summed up his arguments by saying that the court should, within its discretion, award a sentence which would be legal, appropriate, and adequate for the offense committed. It would be difficult to extract from this record a finding that the court members were of the belief they were not free to exercise their discretion in awarding a punitive discharge.

## II

We turn now to a discussion of the appropriateness of the action taken by the convening authority. ▋ Article 64 of the Code, 50 USC § 651, provides:

"In acting on the findings and sentence of a court-martial, the convening authority shall approve only such findings of guilty, and the sentence or such part or amount of the sentence, as he finds correct in law and fact and *as he in his discretion determines should be approved*. Unless he indicates otherwise, approval of the sentence shall constitute approval of the findings and sentence." [Emphasis supplied.]

Article 71(*d*) of the Code, 50 USC § 658, contains an additional grant of power to the convening authority. It prescribes:

"All other court-martial sentences, unless suspended, may be ordered executed by the convening authority when approved by him. The convening authority may suspend the execution of any sentence, except a death sentence."

Those Articles vest wide discretion in the convening authority, and the troublesome question posed by this record is whether that functionary, in this instance, abdicated his power to suspend or disapprove the bad-conduct discharge because he believed the SECNAV Instruction left him without any discretion. In that regard, three documents appearing in the record force us to conclude that he probably misunderstood and misapplied the intent expressed in the instructions. To simplify our approach to the issue, we will set up portions of the letter which might be considered of some relevancy in the case of this accused. Certainly if he is to be considered as a homosexual, he must be catalogued under Class II.

"DEPARTMENT OF THE NAVY
Office of the Secretary
Washington 25, D. C.

*SECNAV INSTRUCTION 1620.1*

From: Secretary of the Navy
To: All Ships and Stations

Subj: Procedure for the disposition of cases of homosexuality involving naval personnel

1. *Purpose*. To promulgate a uniform procedure relative to the disposition of personnel in cases involving homosexual tendencies or acts.

• • • • • •

4. *Action*

a. Known homosexual individuals are military liabilities and must be eliminated from the service. Commanding officers receiving information indicating that a person in the naval service possesses homosexual tendencies or has engaged in an act of homosexuality shall inquire thoroughly and comprehensively into the matter and ascertain all the facts and circumstances of the case, bearing in mind the peculiar susceptibility of such cases to possible malicious charges.

• • • • • •

5. *Classification and Procedures*. Personnel coming within the purview of this directive fall into several categories which may or may not overlap and which will be more or less complicated by facts and circumstances peculiar to the individual case. These cases, however, are generally classified and the normal disposition for each class will be as follows:

• • • • • •

b. (1) *Class II* is defined as those cases wherein personnel, while in the naval service, have engaged in one or more homosexual acts or where

evidence supports proposal or attempt to perform an act of homosexuality, and which do not fall in the category of Class I above.

(2) *Disposition.* Disposition will be accomplished by administrative separation under conditions other than honorable, unless the individual resists separation from the service under such conditions, in which case he will be recommended for trial by court-martial. Detailed procedure follows:

(3) [Provides for written request for undesirable discharge or in the event request is not submitted, for trial by court-martial.]"

In interpreting the instructions, we have encountered some doubts in concluding that they cover the type of crime which was committed by the accused. The whole tenor of the letter is to project persons with homosexual tendencies into a channel for separation from the service. A homosexual is a person who has a morbid sexual passion for one of the same sex and accused's crime was committed with a person of the opposite sex. However, we need not stay by that refined distinction as, for the purpose of this issue, we can assume that accused's conduct brought him within Class II of the letter. While the letter directs separation from the service of persons in that class, there are alternative methods for accomplishing that result. There is no showing in this record that a discharge processed through administrative channels had failed, or would fail, if this court did not impose a punitive discharge. If it could be accomplished in that manner, discharge by a court-martial was not mandatory. We are not disposed to interpret the letter so as to make it conflict with the Code; and if it is a positive direction to a convening authority that he must affirm every punitive discharge in this type of case, it is irreconcilable. While a declaration of policy by a service may influence the manner in which an officer exercises his discretion, it cannot place him in a mental strait jacket which denies him any freedom of choice.

With those observations in mind, let us look to the writings found in the record to determine whether the convening authority did, in fact, exercise his own discretion. First, in point of time is the District Legal Officer's recommendation which was the basis for the subsequent action by the convening authority. The relevant part is as follows:

"That only so much of the sentence as provides for BCD, forfeiture of $100 per month for two months, and conf. at hard labor for 2 months, be approved. *REASON:* Accused was one of three who participated in indecent, lewd and lascivious acts at a smoker at Key West, Fla. However, he was involved to a lesser degree than either of the other two. One of the other accused was sentenced to a BCD, forfeitures, and two months confinement. Foregoing mitigating action recommended in view of the above and in consideration of the unanimous recommendation for clemency, youth of the accused and the limited extent of his participation. *It is not recommended that the BCD be remitted or suspended on probation in view of the policy of the Navy Department contained in SecNav Instr. 1620.1 of 6/5/53 which provides that participants in acts of perversion must be eliminated from the naval service."* [Italics supplied.]

The convening authority, in his decision to approve part of the sentence, stated:

"The court unanimously recommended Doherty to the clemency of the reviewing authority and that the bad conduct discharge be remitted. The convening authority has carefully considered this recommendation which has some merit in view of the youth of the accused and the limited extent of his participation. It appears that he participated at the urging of shipmates while sexually aroused as a result of viewing earlier acts. In addition senior officers were present who should have taken steps to have stopped such a performance. *In view of the policy of the Navy Department (SecNav Instruction 1620.1 of 5 June 1953) which pro-*

*vides that participants in acts of perversion must be eliminated from the naval service, the convening authority is taking no action to remit or suspend the bad conduct discharge. It is recommended, however, that the recommendation of the court be further considered upon the clemency review of this case within the office of the Judge Advocate General of the Navy."* [Italics supplied.]

On August 21, 1953, the convening authority forwarded a letter to The Judge Advocate General of the Navy in which he requested appellate representation before the board of review for this accused and the two other persons who participated in sexual acts with the prostitute. The following two paragraphs from his letter best illustrate his belief that he had no freedom of choice:

"5. The Commandant, in taking mitigating action in the case of subject enlisted persons was limited in the mitigating action which he might take by reason of the policy of the Navy Department expressed in SecNav Instruction 1620.1 of 5 June 1953 which provides that participants in acts of sexual perversion must be eliminated from the naval service.

"6. It is accordingly recommended that the foregoing circumstances be carefully considered in connection with the further clemency review of the cases of subject enlisted persons and that the punishment approved in their cases be mitigated in the interest of equal justice in line with that approved in the cases of other persons involved therein. It is also recommended, particularly in the case of DOHERTY, that consideration be given as to whether an exception might not be made to the policy of the Navy Department set forth in SecNav Instruction 1620.1 of 5 June 1953, in view of all the attending facts."

From a construction of the three documents, it appears, with near certainty, that the convening authority was convinced that his discretion to remit or suspend the bad-conduct discharge had been withdrawn by the letter of the Secretary of the Navy. If he did, he was in error; but we need not go that far for the purposes of this case. All we need find is a fair risk that his act in affirming the punitive discharge was prompted by that belief. An accused is entitled to have his record reviewed by an officer who is free from compulsion to act in a specified manner. If he has discretion, he should not be saddled with a requirement which prevents it from being exercised for the benefit of an accused. While, of course, he must and should give consideration to the policies of his service as factors influencing the penalty imposed, he should consider them in the light of the case he is reviewing, remembering that, in any case, he is free to exercise his own judgment as to whether the sentence, as he approves it, is excessive and inappropriate.

In a somewhat different setting, we have held that statements of policy by a Department are not controlling on the assessment of a sentence. In United States v. Castner, 3 USCMA 466, 13 CMR 22, the court-martial had arrived at and announced a sentence which did not include a reduction in grade. The law officer directed that the court members redeliberate and determine whether they wished to include such a provision in the sentence. He believed that direction necessary because of a declaration of policy by the Department of the Navy that in certain sentences reduction in grade must be included because it was not automatic. There we stated:

"Of special significance here is that this supplemental regulation is a statement of policy only. By it, a naval court-martial is admonished to include a reduction to the lowest enlisted pay grade in a case where the sentence deemed appropriate by the court-martial includes any one of the stated conditions, but a sentence which does not so provide, when tested by the terms of the regulation, is not illegal. Stated differently, the naval regulation is not couched in terms of a positive command. On the contrary it amounts to no more than a policy declaration. We, therefore, conclude that the sentence as

first announced by the court-martial was not illegal."

We need not decide in this case whether the statement that homosexuals must be eliminated from the Naval service is a positive command. We have no control over the administrative discharges of a service and we express no opinion as to what they may do in that field. But, if the language is construed as an inviolable command to those in the military judicial system, such as courts-martial, the convening authorities, or boards of review, then the instructions conflict with the Code and must yield. We do not interpret them to go that far, but we are convinced the convening authority did. If so, he failed to make that independent evaluation of the appropriateness of the sentence approved by him which Congress decreed he make.

We have no authority to affirm such part or parts of a sentence as we determine on the basis of the entire record should be approved. Both the convening authority and boards of review have been granted that power; but the convening authority, in addition, has great latitude in considering whether remissions shall be ordered or suspensions of execution shall be decreed. To remove any and all doubt as to whether he approved the bad-conduct discharge solely because he misunderstood the scope and legal effect of the policy instructions, we are returning the case to him for further consideration. In his reconsideration of the sentence, he should be guided by the principles stated in paragraph 76 of the Manual which, when converted to apply to a convening authority, amount to no more than a caveat that he should not pass on to higher reviewing agencies any sentence which, if permitted to stand, fails to meet his standards of appropriateness. We desire it be understood by all that we are not directing any criticism toward the policy as announced, when applied properly, or toward the convening authority. We commend him for the full explanation found in the record, as it indicates some misgivings about applying inflexibly a policy declaration to all sentences without discriminating between those which have enough merit to be considered as exceptions.

Accordingly, the record is returned to The Judge Advocate General of the Navy with instructions that it be forwarded to the convening authority for reconsideration of his action upon the sentence in the light of the views stated herein.

Judge BROSMAN concurs.

QUINN, Chief Judge (dissenting):

I dissent.

Although I am in accord with some of the principles set out in the majority opinion, I am unable to concur in the conclusion that the court understood its obligation to adjudge an appropriate sentence. The Manual for Courts-Martial provides that a recommendation for clemency should be predicated upon matters other than those presented to the court, and such mitigating circumstances as could not otherwise be taken into consideration in determining the sentence. Paragraph 77a, page 125. Here, the recommendation is based on exactly the same evidence presented in open court. Even more significant is the fact that the recommendation is not only for a suspension of the punitive discharge, but for an unqualified remission of it.

The recommendation is undated. However, there are strong indications that it was initiated by the court, contemporaneously with the imposition of sentence. It is typed on the identical paper used in making the transcript of the record; and, quite unmistakably, it was prepared on the same typewriter. It would, therefore, seem that it was dictated to the court reporter immediately after the sentence was announced and the trial concluded.

Unqualifiedly, I would not sanction any curtailment of the absolute freedom of a court to make recommendations for clemency. Moreover, when such a recommendation is made, it should not subject the court to the risk of having its sentence set aside. But, the inconsistency here between the court's action in imposing a bad-con-

duct discharge and its contemporaneous and unanimous recommendation for its complete remission is so striking and so unusual as to indicate that the court labored under a misapprehension of the full scope of its sentence power. The basis for its misunderstanding appears in the Navy policy against retention of homosexuals.

The majority attempt to dilute the influence of the Navy policy by assuming that the court members would construe it as imposing no limitation on their power to adjudge a sentence in a case of this kind. Paradoxically, the majority hold that the convening authority misunderstood its effect. Contrariwise, I believe that, if the convening authority, who presumptively is much more familiar with the nature and operation of policy matters, was misled, it is at least equally as likely that the court was misled. Consequently, I would return the record to the convening authority for the direction of proceedings in revision, if practicable, or, in the alternative, for a rehearing. Cf. United States v. Bound, 1 USCMA 224, 2 CMR 130.