UNITED STATES, Appellee

v.

Lawrence G. HUTCHINS III, Sergeant
U.S. Marine Corps, Appellant

No. 12-0408

Crim. App. No. 200800393

United States Court of Appeals for the Armed Forces

Argued November 13, 2012

Decided June 26, 2013

ERDMANN, J., delivered the opinion of the court, in which
STUCKY, J., and EFFRON, S.J., joined.  RYAN, J., filed a
separate opinion concurring in the result.  BAKER, C.J., filed a
separate dissenting opinion.

Counsel


For Appellant:  Major S. Babu Kaza, USMC (argued).

For Appellee:  Major Paul M. Ervasti, USMC (argued); Colonel
Stephen C. Newman, USMC, and Brian K. Keller, Esq. (on brief);
Major William C. Kirby, USMC.

Military Judge:  Jeffrey G. Meeks


**This opinion is subject to revision before final publication.**

United States v. Hutchins, No. 12-0408/MC

Judge ERDMANN delivered the opinion of the court.

Contrary to his pleas, Sergeant Lawrence G. Hutchins III was convicted by members at a general court-martial of making a false official statement, unpremeditated murder, larceny, and conspiracy to commit larceny, false official statements, murder, and obstruction of justice in violation of Articles 107, 118, 121, and 81, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 907, 918, 921, 881 (2006).[1] The members sentenced Hutchins to reduction to E-1, confinement for fifteen years, dishonorable discharge, and a reprimand. The convening authority approved a sentence of reduction to E-1, confinement for eleven years, and a dishonorable discharge.

The United States Navy-Marine Corps Court of Criminal Appeals (CCA) concluded that the military judge had improperly severed the attorney-client relationship with one of Hutchins's defense counsel, set aside the findings and sentence, and authorized a rehearing. United States v. Hutchins, 68 M.J. 623, 624, 631 (N-M. Ct. Crim. App. 2010). The Judge Advocate General of the Navy certified the issue involving the termination of the attorney-client relationship to this court pursuant to Article

---

[1] Hutchins was initially charged with one specification of conspiracy to commit larceny, housebreaking, kidnapping, false official statements, murder, and obstruction of justice, two specifications of making false official statements, one specification each of premeditated murder, larceny, housebreaking, and kidnapping, two specifications of obstruction of justice, and four specifications of assault.

67(a)(2), UCMJ, 10 U.S.C. § 867(a)(2) (2006). We reversed the CCA decision holding that while the attorney-client relationship had been improperly severed, Hutchins was not prejudiced. United States v. Hutchins, 69 M.J. 282, 293 (C.A.A.F. 2011). We returned the record of trial to the Judge Advocate General of the Navy for remand to the CCA for further review pursuant to Article 66(c), UCMJ. Id. Upon further review, the CCA affirmed the findings and the sentence as approved by the convening authority. United States v. Hutchins, No. NMCCA 200800393, 2012 CCA LEXIS 93, at *32, 2012 WL 933067, at *12 (N-M. Ct. Crim. App. Mar. 20, 2012) (unpublished).

We granted review to determine whether Hutchins's post-trial rights were influenced by unlawful command influence and whether the military judge erred when he denied the defense motion to suppress Hutchins's statement made to the Naval Criminal Investigative Service (NCIS) after having invoked his right to counsel.[2] We hold that the NCIS request to Hutchins for

---

[2] We granted review of the following issues:

> I. Whether the findings and sentence must be dismissed with prejudice where unlawful command influence from the Secretary of the Navy has undermined substantial post-trial rights of the Appellant.
>
> II. The Appellant was interrogated by NCIS concerning his involvement in the alleged crimes, and terminated the interview by invoking his right to counsel. Appellant was thereafter held incommunicado and placed in solitary confinement

United States v. Hutchins, No. 12-0408/MC

his consent to search his belongings reinitiated communication with Hutchins in violation of his Fifth Amendment rights as interpreted by the Supreme Court in Edwards v. Arizona, 451 U.S. 477 (1981), and Oregon v. Bradshaw, 462 U.S. 1039 (1983).  We therefore reverse the decision of the CCA, set aside the findings and the sentence, and return the case to the Judge Advocate General of the Navy.[3]

## Factual Background

The charges against Hutchins arose from an incident that occurred in April 2006 while Hutchins was a squad leader in Iraq and his unit was conducting counterinsurgency operations.  The CCA summarized the facts of the offenses as follows:

> where he was denied the ability to communicate with a lawyer or any other source of assistance. Appellant was held under these conditions for 7 days, whereupon NCIS re-approached Appellant and communicated with him regarding their ongoing investigation.  In response, Appellant waived his previously invoked right to counsel and subsequently provided NCIS a sworn statement concerning the alleged crimes.  Did the military judge err when he denied the defense motion to suppress the Appellant's statement?  See Edwards v. Arizona, 451 U.S. 477 (1981) and United States v. Brabant, 29 M.J. 259 (C.M.A. 1989).

United States v. Hutchins, 71 M.J. 344 (C.A.A.F. 2012) (order granting review).

[3] Issue I addresses matters occurring during the post-trial appellate and secretarial review of the case.  Issue II addresses claims of error at trial.  In light of our resolution of Issue II -- that the military judge committed prejudicial error at trial in failing to suppress Hutchins's statement -- Issue I has no bearing on our decision.  Accordingly, we do not address granted Issue I.  Hutchins, 71 M.J. 344.

4

The appellant was assigned as squad leader for 1st Squad, 2nd Platoon, Kilo Company, 3rd Battalion, 5th Marines, assigned to Task Force Chromite, conducting counter-insurgency operations in the Hamdaniyah area of Iraq in April 2006. In the evening hours of 25 April 2006, the appellant led a combat patrol to conduct a deliberate ambush aimed at interdicting insurgent emplacement of improvised explosive devices (IEDs). The court-martial received testimony from several members of the squad that indicated the intended ambush mission morphed into a conspiracy to deliberately capture and kill a high value individual (HVI), believed to be a leader of the insurgency. The witnesses gave varying testimony as to the depth of their understanding of alternative targets, such as family members of the HVI or another random military-aged Iraqi male.

Considerable effort and preparation went into the execution of this conspiracy. Tasks were accomplished by various Marines and their corpsman, including the theft of a shovel and AK-47 from an Iraqi dwelling to be used as props to manufacture a scene where it appeared that an armed insurgent was digging to emplace an IED. Some squad members advanced to the ambush site while others captured an unknown Iraqi man, bound and gagged him, and brought him to the would-be IED emplacement.

The stage set, the squad informed higher headquarters by radio that they had come upon an insurgent planting an IED and received approval to engage. The squad opened fire, mortally wounding the man. The appellant approached the victim and fired multiple rifle rounds into the man's face at point blank range.

The scene was then manipulated to appear consistent with the insurgent/IED story. The squad removed the bindings from the victim's hands and feet and positioned the victim's body with the shovel and AK-47 rifle they had stolen from local Iraqis. To simulate that the victim fired on the squad, the Marines fired the AK-47 rifle into the air and collected the discharged casings. When questioned about the action, the appellant, like other members of the squad, made false official statements, describing the situation as a legitimate ambush and a "good shoot." The death was brought to the appellant's battalion commander's

> attention by a local sheikh and the ensuing
> investigation led to the case before us.

2012 CCA LEXIS 93, at *4-*6, 2012 WL 933067 at *2 (paragraph

formatting added).

On May 11, 2006, NCIS initiated an interrogation of

Hutchins after advising him of his rights in accordance with

Miranda v. Arizona, 384 U.S. 436 (1966), and Article 31(b),

UCMJ, 10 U.S.C. § 831(b) (2006). Following Hutchins's

invocation of his right to an attorney, NCIS properly terminated

the interrogation. At that point Hutchins was confined to a

trailer under guard where he was held essentially in solitary

confinement and was not allowed to use a phone or to otherwise

contact an attorney. The Government conceded that these

conditions were restriction tantamount to confinement. However,

despite the requirements of Military Rule of Evidence (M.R.E.)

305(d)(2) and Rule for Courts-Martial (R.C.M.) 305(f), the

Government made no effort to secure an attorney for Hutchins

during this period.

After a week of confinement under these conditions, on May

18, 2006, the same NCIS investigator who had interrogated

Hutchins on May 11 entered his trailer in the late evening and

asked for permission to search his personal belongings. The

investigator provided Hutchins with a Permissive Authorization

for Search and Seizure form which reminded him that he was still

under investigation for conspiracy, murder, assault, and

kidnapping.  While reading this form, Hutchins asked if the door

was still open to give his side of the story.  Hutchins

consented to the search and signed the form.

The investigator informed Hutchins that he could talk to

them but not that night.[4]  The next morning Hutchins was taken to

NCIS where he was readvised of his Article 31 rights.  Hutchins

waived his rights, was interrogated, and subsequently provided a

detailed written confession.

Discussion

Introduction:

The Government argues that this case is governed by the

holding in United States v. Frazier, 34 M.J. 135, 137 (C.M.A.

1992), that "[a] request for consent to search does not infringe

upon Article 31 or Fifth Amendment safeguards against self-

incrimination because such requests are not interrogations and

the consent given is ordinarily not a statement."  We do not

take issue with that basic principle and agree that the NCIS

request to search Hutchins's personal belongings on May 18 was

not an interrogation.  The principle set forth in Frazier,

however, does not end our inquiry.  Once Hutchins requested an

attorney, under Edwards he could not be further interrogated

unless:  (1) counsel had been made available; or, (2) Hutchins

reinitiated further "communication, exchanges, or

---

[4] The investigator testified that he was exhausted after a long day and wanted to be fresh the next morning.

conversations." Edwards, 451 U.S. at 484-85. As no attorney was made available to Hutchins, the Edwards inquiry in this case centers on whether, under the circumstances of this case, it was the Government or Hutchins that reinitiated further communication under Edwards and Bradshaw.

Edwards and Bradshaw -- Reinitiation of the Communication:

Since the Supreme Court's decision in Edwards in 1981, it has been clear that:

> [A]n accused . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

Edwards, 451 U.S. at 484-85 (emphasis added).

There is no disagreement between the parties that Edwards applies to the circumstances of this case. However, the parties differ as to whether NCIS or Hutchins initiated further "communication, exchanges, or conversations." Hutchins argues that the request for consent to search was an initiation of further communication by NCIS in violation of Edwards because it was directly related to the criminal investigation and was not merely incidental to the custodial relationship, citing Bradshaw, 462 U.S. at 1044. The Government responds that, under Frazier, the request for consent to search is not an interrogation and therefore such a request did not initiate further "interrogation" as proscribed by Edwards.

8

The fundamental purpose of the judicially crafted rule in Edwards is to "[p]reserv[e] the integrity of an accused's choice to communicate with police only through counsel." Patterson v. Illinois, 487 U.S. 285, 291 (1988). The need for such a rule is to provide added protection against the coercive pressures of continuous custody after an individual has invoked his right to counsel, because he is "cut off from his normal life and companions, thrust into and isolated in an unfamiliar, police-dominated atmosphere, where his captors appear to control his fate."[5] Maryland v. Shatzer, 559 U.S. 98, 106 (2010) (citations omitted) (internal quotation marks and brackets omitted).

The Court in Oregon v. Bradshaw stated:

[The test in Edwards] was in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers . . . [and we] restated the requirement in Wyrick v. Fields, 459 U.S. 42, 46 (1982) (per curiam), to be that before a suspect in custody can be subjected to further interrogation after he requests an attorney there must

---

[5] "Fidelity to the doctrine announced in Miranda requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." Berkemer v. McCarty, 468 U.S. 420, 437 (1984). It is hard to imagine a situation where this would be more of a concern than in the present case, i.e., while deployed to a foreign country in a combat environment Hutchins was held in essentially solitary confinement in a trailer for seven days after invoking his right to counsel; despite his request for counsel, no attorney was provided during this period and no explanation was provided to Hutchins as to why; he was held incommunicado (other than a chance conversation with a chaplain for three or four minutes); and he was not allowed to use a phone, the mail system, or other means of communication to contact an attorney, family, friends, or anyone else.

> be a showing that the "suspect himself initiates dialogue with the authorities."

Bradshaw, 462 U.S. at 1044.

Not all communications initiated by an accused or law enforcement will trigger the protections under Edwards.[6] The Court in Bradshaw went on to distinguish between inquiries or statements by either a police officer or a defendant that represented a desire to open a more "generalized discussion relating directly or indirectly to the investigation" and those "inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship." Id. at 1045. The former circumstance constitutes a reinitiation of communication while the latter circumstance does not. The Edwards rule does not merely prohibit further interrogation without the benefit of counsel, it prohibits further "communication, exchanges, or conversations" that may (and in this case, did) lead to further interrogation. 451 U.S. at 485. Under Bradshaw, the issue before this court is whether the NCIS agent opened a more "generalized discussion relating directly or indirectly to the

---

[6] See Bradshaw, 462 U.S. at 1045 ("While we doubt that it would be desirable to build a superstructure of legal refinements around the word 'initiate' in this context, there are undoubtedly situations where a bare inquiry by either a defendant or by a police officer should not be held to 'initiate' any conversation or dialogue.").

investigation" or whether his inquiry related to "routine incidents of the custodial relationship." 462 U.S. at 1045.

The NCIS investigator was forthright in his testimony that he initiated contact with Hutchins on May 18 to further the investigation.[7] The investigator testified that he requested permission to search Hutchins's personal belongings that he had brought from Abu Ghraib to look for any media that could contain photographs. In connection with this request Hutchins was provided a permissive search authorization to sign. Importantly, the search authorization again reminded Hutchins that he was under investigation for conspiracy, murder, assault, and kidnapping. Its purpose was to seek Hutchins's cooperation in the ongoing investigation by providing his consent to a search of his belongings. The investigator testified that it was while Hutchins was reading that form that he asked if there was still an opportunity to talk to NCIS and give his side of the story. This request for consent to search by the NCIS initiated a generalized discussion which related directly to the

---

[7] [Defense Counsel]: Now, getting to your purpose for coming back to Sergeant Hutchins, you went back to Sergeant Hutchins to further your investigation, didn't you?

[Investigator]: Yes

United States v. Hutchins, No. 12-0408/MC

ongoing investigation as contrasted to a bare inquiry about routine incidents of Hutchins's custody.[8]

Frazier -- A Request to Search is Not an Interrogation:

The Government's reliance on the holding in Frazier is misplaced in this situation. Frazier stands for the proposition that a request for consent to search does not "infringe upon Article 31 or Fifth Amendment safeguards against self-incrimination because such requests are not interrogations and the consent given is ordinarily not a statement." Frazier, 34 M.J. at 137. Frazier, however, did not involve or address the reinitiation of communications by law enforcement after an accused has invoked his right to counsel and cannot be held to modify or nullify the protections established by Edwards and Bradshaw.[9]

_____

[8] See Bradshaw, 462 U.S. at 1045 ("There are some inquiries, such as a request for a drink of water or a request to use a telephone . . . relating to routine incidents of the custodial relationship, [that] will not generally 'initiate' a conversation in the sense in which that word was used in Edwards."); see also United States v. Applewhite, 23 M.J. 196, 199 (C.M.A. 1987) (request to take a polygraph examination initiated by investigator after an invocation of right to counsel was "in blatant disregard of Miranda and Edwards").
[9] As noted, generally a request for consent to search does not itself implicate the Fifth Amendment. 34 M.J. at 135. This is because a request for consent to search is not considered "interrogation." Id.; see also M.R.E. 305(b)(2) (defining "interrogation" as including "any formal or informal questioning in which an incriminating response either is sought or is a reasonable consequence of such questioning"); Rhode Island v. Innis, 446 U.S. 291, 301 (1980) ("'[I]nterrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of police (other than those

12

Conclusion:

Hutchins's subsequent May 19 statement was a direct result of the reinitiation of communication by NCIS.[10]  Accordingly, under the circumstances of this case, it was error for the military judge to admit the statement made by Hutchins on May 19, 2006.[11]  For an error in admitting the statement to be harmless beyond a reasonable doubt, this court must be convinced that there was no reasonable likelihood that its erroneous admission contributed to the verdict.  See United States v. Mitchell, 51 M.J. 234, 240 (C.A.A.F. 1999).  The Government made use of Hutchins's detailed statement in its opening statement, closing argument, and rebuttal argument and as evidence to

---

normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response.").  To be clear, our decision in this case does not affect this basic proposition.  However, the issue we address today is not whether the request for consent to search was an "interrogation," but rather was it a reinitiation of "further communication" prohibited by Edwards and Bradshaw.

[10] Although a request for consent to search is not in itself an interrogation under Frazier, we do not agree with the dissent's suggestion that such a request has no bearing on the separate legal question as to whether, under all the surrounding circumstances, the Government reinitiated a communication under Edwards and Bradshaw.  United States v. Hutchins, __ M.J. __, __ (6-10) (C.A.A.F. 2013) (Baker, C.J., dissenting).  In this case, for example, the communication was more than a simple request for consent to search, but instead included an implicit accusatory statement.

[11] Because the Government reinitiated communication with Hutchins concerning the criminal investigation, it is unnecessary to resolve whether Hutchins knowingly and intelligently waived the prior invocation of his right to counsel before the interrogation that resulted in his statement on May 19, 2006.  See Edwards, 451 U.S. at 482.

United States v. Hutchins, No. 12-0408/MC

corroborate other evidence and to attack the opinion of the

defense expert witness.  Therefore, notwithstanding the other

evidence of Hutchins's guilt, there is a reasonable likelihood

that the statement contributed to the verdict.

## Decision

The request by NCIS to Hutchins for his consent to search

his belongings reinitiated communication with Hutchins in

violation of his Fifth Amendment rights as interpreted by the

Supreme Court in Edwards v. Arizona, 451 U.S. 477 (1981), and

Oregon v. Bradshaw, 462 U.S. 1039 (1983).  Accordingly, the

decision of the United States Navy-Marine Corps Court of

Criminal Appeals is reversed.  The findings and the sentence are

set aside.  The record is returned to the Judge Advocate General

of the Navy for referral to an appropriate convening authority

who may authorize a rehearing.

United States v. Hutchins, No. 12-0408/MC

RYAN, Judge (concurring in the result):

This case presents the very close question whether, under the circumstances, the Naval Criminal Investigative Service's (NCIS) request for consent to search Appellant's personal belongings constituted a reinitiation of interrogation under Edwards v. Arizona, 451 U.S. 477 (1981), and, therefore, a violation of Appellant's Fifth Amendment right to not incriminate himself. It is clear that a mere request for a permissive search authorization is not itself an interrogation, see United States v. Frazier, 34 M.J. 135, 137 (C.M.A. 1992) ("A request for a consent to search does not infringe upon Article 31 or Fifth Amendment safeguards against self-incrimination because such requests are not interrogations and the consent given is ordinarily not a statement."), and I do not read the majority to suggest that it is.

Recognizing, however, that a mere request for a search authorization is not an interrogation does not answer the distinct question whether, under the unique circumstances of this case, the reinitiation of contact by NCIS for an otherwise permissible purpose was "reasonably likely to elicit an incriminating response from the suspect," and thus an interrogation nonetheless. Rhode Island v. Innis, 446 U.S. 291, 301 (1980) (footnote omitted). In my view,

the admissibility of Appellant's confession turns on that question, and no cases with like facts clearly dictate the answer.

In Edwards v. Arizona, the Supreme Court held that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." 451 U.S. at 484. The Court further held that when an accused invokes his right to counsel, he is "not subject to further interrogation . . . until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Id. at 484-85. Statements made after a suspect invokes his right to counsel and in response to further custodial interrogation "d[o] not amount to a valid waiver and hence [are] inadmissible." Id. at 487.

This bright-line rule serves as a "second layer of prophylaxis" safeguarding "a suspect's right to have counsel present at a subsequent interrogation if he had previously requested counsel," Maryland v. Shatzer, 130 S. Ct. 1213, 1219 (2010) (citation and internal quotation marks omitted), and is separate and distinct from the

question whether a suspect's waiver was otherwise "knowing, intelligent, and voluntary under the 'high standar[d] of proof . . . [set forth in] Johnson v. Zerbst, 304 U.S. 458 (1938),'" Shatzer, 130 S. Ct. at 1219 (alterations in original) (quoting Miranda v. Arizona, 384 U.S. 436, 475 (1966)); see also Oregon v. Bradshaw, 462 U.S. 1039, 1044-45 (1983) (plurality opinion); id. at 1053 (Marshall, J., with whom Brennan, J., Blackmun, J., and Stevens, J., joined, dissenting) (agreeing with the majority on this point of law).  My agreement with Chief Judge Baker, then, that Appellant's waiver was not involuntary under "Zerbst's traditional standard of waiver," Shatzer, 130 S. Ct. at 1219, does not end the inquiry.

Edwards does not protect against all reinitiations of contact with a suspect held in continuous custody who has invoked his right to counsel –- only those that the government should reasonably expect to result in an incriminating statement.  See Innis, 446 U.S. at 301.  We view the latter class of reinitiations with a jaundiced eye and compare it to the psychological ploys that necessitated the protections first instituted in Miranda.  See Miranda, 384 U.S. at 448-57.  Whether NCIS' reinitiation of contact with Appellant should be deemed a reinitiation of interrogation in contravention of Edwards turns on whether

NCIS should have known that its actions were "reasonably likely to elicit an incriminating response."  Innis, 446 U.S. at 301; see also United States v. Brabant, 29 M.J. 259, 262-63 (C.A.A.F. 1989).

In making this determination, we must consider, among other things, that:  (1) after Appellant invoked his right to counsel during his initial interrogation, he was held in sequestration in a war zone for seven days; (2) during this period of solitary confinement, Appellant was neither provided an attorney nor permitted to contact one; (3) Appellant was not permitted to speak with anyone other than the chaplain, use any facilities other than the head and shower, or have access to phones, computers, or other methods of communication; (4) the Government's explanation as to why it did not provide Appellant with an attorney or the ability to even contact one during this seven-day period of sequestration was that "[it] is not required," Audio recording of oral argument at 29:18, United States v. Hutchins, __ M.J.__ (C.A.A.F. Nov. 13, 2012) (No. 12-0408) http://www.armfor.uscourts.gov/newcaaf/calendar/2012-11.htm#13; (5) after Appellant was held in sequestration for seven days, the NCIS agent who had conducted Appellant's initial interrogation reinitiated contact with him to obtain a permissive search authorization; and (6)

4

Appellant did not make a statement until the day following NCIS' request for consent to search and after cleansing warnings were provided.

While (6) is strong evidence that Appellant's confession was not involuntary under Zerbst, it does not answer the altogether different question whether, under the circumstances, NCIS should have known that its reinitiation of contact with Appellant, made for any purpose, was reasonably likely to elicit an incriminating statement in violation of Edwards. The military judge did not consider this question, which is different from whether law enforcement was engaged in intentional subterfuge.

After considering the facts outlined above, and that the prosecution has the burden to "demonstrate by a preponderance of the evidence that [Appellant] initiated the communication leading to the waiver," Military Rule of Evidence 305(g)(2)(B)(i), I resolve this close question in Appellant's favor.

Moreover, while I agree with much of Chief Judge Baker's analysis of whether the Secretary of the Navy's (the Secretary) comments resulted in unlawful command influence, I disagree with two aspects of his discussion.

First, in my view, Chief Judge Baker blurs the distinction between the doctrines of actual and apparent

unlawful command influence by suggesting that the Secretary of the Navy's comments did not constitute unlawful command influence either because (1) the Secretary did not intend to influence the outcome of Appellant's proceedings, or (2) his comments did not actually affect any judicial or reviewing authority.  See Hutchins, __ M.J. at __ (28, 31-34, 41) (Baker, C.J., dissenting).  Of course, if a speaker intends to influence a judicial or reviewing authority and that speaker actually influences that authority, the speaker will have likely committed actual unlawful command influence.  See United States v. Lewis, 63 M.J. 405, 414 (C.A.A.F. 2006) (finding actual unlawful command influence where the Government's "orchestrated effort to unseat [the military judge] exceeded any legitimate exercise of [its] right" to challenge her).  In my view, apparent unlawful command influence may be shown even without proof that the speaker intended to influence a particular authority or that any authority was actually influenced.  The focus of apparent unlawful command influence is whether a reasonable, disinterested member of the public, fully informed of all the facts, would perceive the military justice system as fair.  Id. at 415.

Second, Article 37, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 837 (2006), which prohibits unlawful

6

command influence, has been in existence since the UCMJ was established in 1950, see Act of May 5, 1950, Pub. L. No. 81-506, ch. 169, 64 Stat. 107, 120 (Article 37), and there has been no showing whatsoever that its prohibition against unlawful command influence trammels upon the statutory or constitutional duties of senior civilian leaders such as the Secretary, or that the two are incompatible in any way. I thus disagree that there is any justification for the civilian head of the Department of the Navy's inflammatory comments on a case where neither appellate review nor the clemency process are complete. But see Hutchins, __ M.J. at __ (29) (Baker, C.J., dissenting) ("Senior officials dealing with national security questions that also implicate military justice concerns must contemplate . . . the impact on foreign relations and national security of not commenting at all.").

Appellant was convicted of unpremeditated murder. In November 2009, despite both ongoing appellate review and the annual Naval Clemency & Parole Board (NC&PB) review process, the Secretary made widely disseminated, public comments, which left no doubt about his strong view that Appellant had already received substantial clemency from the convening authority and would receive no further clemency. Moreover, despite the fact that Appellant was

acquitted of premeditated murder, the Secretary emphatically stated that Appellant had committed that crime. As quoted in several military publications, he stated that the murder was:

> [S]o completely premeditated, that it was not in the heat of battle, that not only was the action planned but the cover-up was planned, and that they picked somebody at random, just because he happened to be in a house that was convenient. He was murdered.

The Secretary further stated that (1) Appellant had not acted "'in the fog of war,'" (2) "'[the] sentence [was] commensurate with the crime,'" and (3) Appellant had been granted "'substantial clemency already,'" referring to the convening authority's approval of only eleven of the fifteen years confinement provided for in the adjudged sentence.

Following these events, and as relevant to the unlawful command influence claim before this Court, the NC&PB, which had previously recommended that Appellant receive a six-year reduction in his sentence, recommended that he receive no clemency or parole at all. Whether the Secretary's comments actually caused the NC&PB's change of heart is irrelevant in assessing apparent unlawful command influence, as "the mere appearance of unlawful command influence may be 'as devastating to the military justice

8

system as the actual manipulation.'" United States v. Ashby, 68 M.J. 108, 128 (C.A.A.F. 2009) (quoting United States v. Ayers, 54 M.J. 85, 94-95 (C.A.A.F. 2000)).

In Appellant's case, "a reasonable member of the public," Lewis, 63 M.J. at 415, apprised of the Secretary's unequivocal, publicized position that Appellant deserved no further clemency, would "harbor a significant doubt about the fairness," id., of Appellant's annual NC&PB clemency review. This doubt would be bolstered by (1) the NC&PB's dramatic change following the Secretary's comments that Appellant receive no clemency or parole; (2) the subordinate status of all NC&PB members to the Secretary, see Dep't of the Navy, Sec'y of the Navy Instruction, Dep't of the Navy Clemency and Parole Systems pt. I, § 111, at I-2 (June 12, 2003) [hereinafter SECNAVINST 5815.3J]; and (3) the fact that any NC&PB clemency or parole recommendation would have to be approved by the Assistant Secretary of the Navy M&RA, see id. pt. II, § 205, at II-3, who was presumably aware of the Secretary's position on this matter. That Appellant ultimately received 251 days of clemency -- a period commensurate with the duration of his release following United States v. Hutchins, 68 M.J. 623 (N-M. Ct. Crim. App. 2010) -- is far from curative of the apparent unlawful command influence when viewed in light of

9

the NC&PB's initial recommendation of six years of clemency.

No member of the public, aware of the remarks made and the change in clemency recommendation that occurred, could fail to harbor grave concerns that the change in the NC&PB's clemency recommendation was directly related to the Secretary's intemperate remarks about Appellant, in a case where neither appellate review nor clemency proceedings had been completed. These concerns are not cured by the facts that (1) Appellant has no right to any clemency at all, (2) the Secretary need not feel impartial about Appellant's actions, and (3) the Secretary has the ultimate authority to grant any or no clemency. Here, the Secretary's brash public remarks resulted in the appearance of unlawful command influence.

In my view, the Secretary's disturbing and inappropriate comments created an "intolerable strain on public perception of the military justice system," United States v. Simpson, 58 M.J. 368, 374 (C.A.A.F. 2003) (citation and internal quotations marks omitted), with respect to the clemency proceedings. We are not, however, in a position to repair this damage because SECNAVINST 5815.3J limits the NC&PB's role in Appellant's clemency process to one that merely advises the Secretary on a

matter committed, by statute, to his discretion. SECNAVINST 5815.3J, pt. III, § 308(a)(6)(d)-(e), at III-6. Moreover, Ohio Adult Parole Authority v. Woodard, 523 U.S. 272 (1998), represents a sharp limitation on this Court's role in safeguarding clemency proceedings that "are not part of the trial -- or even of the adjudicatory process," id. at 284.

These reasons, however, provide a very different basis for declining to act in this case than either suggesting that such comments did not result in apparent unlawful command influence because the Secretary did not intend to or actually affect the proceedings or are otherwise justifiable.

"'[A] prime motivation for establishing [this Court] was to erect a further bulwark against impermissible command influence.'" United States v. Harvey, 64 M.J. 13, 17 (C.A.A.F. 2006) (citation and footnote omitted). "Fulfilling this responsibility is fundamental to fostering public confidence in the actual and apparent fairness of our system of justice." Id. We cannot decline to criticize the Secretary for making the remarks he made, and by implication lend our own judicial imprimatur to the civilian leadership's making of such public statements

11

about cases where neither appellate review nor the clemency

process are complete.

BAKER, Chief Judge (dissenting):

INTRODUCTION

I respectfully dissent for two reasons.  First, I do not agree with the majority's conclusion that the Naval Criminal Investigation Service (NCIS) agent's request for a permissive search authorization constitutes reinitiation of communication in violation of Appellant's Fifth Amendment rights.  Appellant initiated communication with the NCIS agents, and his statement was both voluntary and the result of a knowing waiver of his right to counsel.  Therefore, the military judge did not abuse his discretion in denying the motion to suppress the statement, and the statement was properly admitted into evidence.

Second, by failing to address the allegations of unlawful command influence, the majority avoids a systemically important question and central aspect of the case, which warrants inquiry and consideration by this Court.  This case raises matters of first impression involving the scope of Article 37, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 837 (2006), and the nature of a service secretary's clemency process, as well as the general question of whether the prohibition against unlawful command influence bars policymakers from addressing matters of national and foreign policy importance where they also involve issues of military justice and executive clemency.  While I would ultimately find that Appellant has not met his burden of

raising "some evidence" of unlawful command influence, these matters deserve full and fair consideration.

ADMISSIBILITY OF APPELLANT'S STATEMENT

Background

On May 10, 2006, Appellant and the members of his squad were transferred to Fallujah for questioning as "suspects in a homicide." Upon arrival, all members of his squad had their weapons confiscated and were not permitted to communicate with each other. Appellant and the other members were billeted in trailers referred to as "cans." "The doors of the trailer rooms were locked, and the locks had to be opened with a key from both sides." When outside the "cans," an escort remained with them at all times.

On May 11, 2006, NCIS agents questioned Appellant at Camp Fallujah. The agents informed Appellant that he was suspected of the offenses for which he was subsequently charged. He was also properly advised of his rights. Appellant waived his rights and stated that the shooting was part of an ambush. When the agents confronted him with evidence indicative of a homicide, Appellant invoked his right to counsel. The agents terminated the interrogation and returned Appellant to custody.

For the next seven days, Appellant remained in the "can." While Appellant spoke with the chaplain, he was not permitted to use morale, welfare, and recreation facilities, to have access

2

to phones, computers, or mail, or to communicate with other members of the squad. Appellant was allowed to use the latrine and shower facilities. The military judge found that, during this time period, the Government "made no direct or indirect attempts to contact him . . . or to persuade him to reopen discussion." Nor did the Government provide Appellant with counsel, as requested.

On May 18, 2006, NCIS agents approached Appellant to obtain permissive authorization to search his belongings, which he granted. The military judge made findings, based on his assessment of the witnesses' testimony, that "the agents strictly restricted their contact with the accused to the request for permissive authorization for a search of his belongings" and "the government did not seek to discuss the case with the accused further." As they searched, Appellant asked if "the door was still open to discuss his side of the story." An agent reminded Appellant that he had exercised his right to counsel, and told Appellant that they did not have time to talk that night, which the military judge found "directly contradicts any allegation that this visit to his can was a subterfuge to reinitiate contact." The agent told Appellant that he was not sure what time the following day Appellant would be sent back to the United States, but said that they would speak with him if there was time.

The next day, May 19, the NCIS agents again informed Appellant of his rights. Appellant "expressly waived those rights and indicated a continued desire to reinitiate contact with the government without the benefit of counsel." Appellant gave a lengthy, detailed statement.

Discussion

This Court reviews a military judge's denial of a motion to suppress a confession for an abuse of discretion. A military judge's findings of fact are reviewed for clear error. United States v. Chatfield, 67 M.J. 432, 437 (C.A.A.F. 2008) (citing United States v. Pipkin, 58 M.J. 358, 360 (C.A.A.F. 2003); United States v. Leedy, 65 M.J. 208, 213 (C.A.A.F. 2007)). However, voluntariness of a confession is a question of law that this Court reviews de novo. Chatfield, 67 M.J. at 437 (citing Arizona v. Fulminante, 499 U.S. 279, 287 (1991); United States v. Bubonics, 45 M.J. 93, 94-95 (C.A.A.F. 1996)).

Appellant argues that the subsequent inculpatory statement on May 19 was involuntary and thus erroneously admitted into evidence. First, Appellant contends, and the majority incorrectly holds, that under Edwards v. Arizona, 451 U.S. 477 (1981), it was the agents, not Appellant, who reinitiated interrogation. Second, in the custodial context presented in Iraq, Appellant argues that the statement was not a product of

4

voluntary choice, but that his will was overborne by seven days of custodial isolation in the "can."

Reinitiation of Communication

The majority's assertion that a request for a permissive search authorization constitutes reinitiation of communication in violation of Appellant's Fifth Amendment rights both misapprehends the Edwards doctrine and directly contradicts the jurisprudence of this Court and every federal court of appeals to have addressed this issue.

Under Edwards, when an accused invokes his right to counsel during custodial interrogation, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards, 451 U.S. at 484-85.[1]  On one side of the equation, the authorities are barred from interrogation, which has been

---

[1] In military practice, Military Rule of Evidence (M.R.E.) 305(e)(1) incorporates the Edwards rule, stating:

> Absent a valid waiver of counsel under subdivision (g)(2)(B), when an accused or person suspected of an offense is subjected to custodial interrogation . . . and the accused or suspect requests counsel, counsel must be present before any subsequent custodial interrogation may proceed.

Subsection (g)(2)(B)(i) describes a waiver as valid, if by a preponderance of evidence the government demonstrates "the accused or suspect initiated the communication leading to the waiver."

broadly interpreted to include "express questioning or its functional equivalent" of "any words or actions . . . that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). This Court has defined "reinitiation of interrogation" in violation of Edwards to include a confrontation having "the natural tendency to induce the making of a statement by" Appellant. United States v. Brabant, 29 M.J. 259, 262-63 (C.M.A. 1989) (internal quotation marks omitted). On the other side, the accused may initiate further communication, exchanges, or conversations by making inquiries or statements that can "be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." Oregon v. Bradshaw, 462 U.S. 1039, 1045 (1983).

In summary, while the authorities must halt the interrogation after invocation of the right to counsel, "[i]f a defendant makes a statement in response to words or actions by the police that do not constitute interrogation or if the defendant himself initiates further communications, the police are not prohibited from 'merely listening' to his voluntary statement." United States v. Jones, 600 F.3d 847, 855 (7th Cir. 2010); see also Alvarez v. McNeil, 346 F. App'x 562 (11th Cir. 2009); Clayton v. Gibson, 199 F.3d 1162 (10th Cir. 1999); United

6

States v. Gonzalez, No. 97-4541, 1998 U.S. App. LEXIS 14891,

1998 WL 377901 (4th Cir. July 1, 1998) (unpublished table

decision); United States v. Colon, 835 F.2d 27 (2d Cir. 1987).

"Volunteered statements of any kind are not barred by the Fifth

Amendment." Miranda v. Arizona, 384 U.S. 436, 478 (1966).[2] As

the majority acknowledges, this Court has already determined

that, "[a] request for a consent to search does not infringe

---

[2] The majority conflates the two doctrines and interprets Edwards and Bradshaw as barring the authorities from initiating not only any words or actions that are reasonably likely to elicit an incriminating response, but any communication which has the result of leading directly or indirectly to discussion of the investigation. Moreover, in this case, the military judge found that the communication in question was no more than a request to search, a well-established exception to the Edwards rule. See infra pp. 9-15. The majority fails to cite any authority to support such an expansion of the Edwards and Bradshaw doctrines, in direct opposition to the case law of this Court and the federal courts of appeals. While the Supreme Court has not directly addressed this issue, Justices Brennan and Marshall, who dissented in Bradshaw in favor of a broader interpretation of Edwards protections, were clear that the doctrine only barred the authorities from words and acts amounting to interrogation. See James v. Arizona, 469 U.S. 990, 993 (1984) (order denying certiorari) (Brennan, J., with whom Marshall, J., joined, dissenting) ("Under the strict rule of Edwards and Bradshaw once an accused has invoked the right to counsel no further interrogation is permitted until the accused initiates a new dialogue with the authorities. Sergeant Midkiff's query '[i]s he going to show us where the body is,' though directed at Officer Davis, indisputably triggered James' statement 'I'll show you where the body is.' That James made the statement in response to Midkiff's inquiry is not, however, determinative of the 'initiation' question. If Midkiff's inquiry is not viewed as interrogation for Fifth Amendment purposes, then James' response might be a voluntary initiation of dialogue. Some official statements made within earshot of an accused in custody are not 'interrogation' even if they prompt a response.").

upon Article 31 or Fifth Amendment safeguards against self-incrimination because such requests are not interrogations and the consent given is ordinarily not a statement." United States v. Frazier, 34 M.J. 135, 137 (C.M.A. 1991).[3]  Moreover, the military judge found that "the agents strictly restricted their contact with the accused to the request for permissive authorization for a search of his belongings" and "the government did not seek to discuss the case with the accused further."  In other words, it was not a circumstance where the agents baited their words to encourage or elicit a response, which is further evidenced by the fact that the agents did not follow-up Appellant's question by taking an immediate statement, but waiting until the next day.  As the military judge found, this "directly contradicts any allegation that this visit to his can was a subterfuge to reinitiate contact."

Federal courts of appeals that have considered this issue "unanimously agree that consenting to a search is not an incriminating statement under the Fifth Amendment because the consent is not evidence of a testimonial or communicative

---

[3] The majority's reference to United States v. Applewhite, 23 M.J. 196 (C.M.A. 1987), is misplaced.  Unlike consent to search, a polygraph examination involves evidence of a testimonial or communicative nature, which is why this Court held that it constituted further interrogation.  Id. at 198 ("Rather than immediately ceasing all interrogation as the law requires, however, Agent Bernardi asked appellant to submit to further interrogation in the form of a polygraph examination.").

nature," United States v. Cooney, 26 F. App'x 513, 523 (6th Cir. 2002), and Fifth Amendment protections only apply to incriminating evidence of a testimonial or communicative nature. Schmerber v. California, 384 U.S. 757, 760–61 (1966).[4]

The majority fails to address, however, this Court's prior holdings that, since a request for consent to search does not constitute an interrogation, Edwards does not bar police authorities from requesting the suspect's consent to a search before he or she has consulted with counsel.  United States v.

---

[4] See, e.g., United States v. Lewis, 921 F.2d 1294, 1303 (D.C. Cir. 1990) ("[I]f the judge meant to suggest that an officer must issue a Miranda warning before asking permission to search an individual, 'every federal circuit court that has addressed the question has reached the opposite conclusion.'");  United States v. Faruolo, 506 F.2d 490, 495 (2d Cir. 1974) (citation omitted) ("The argument that Miranda warnings are a prerequisite to an effective consent to search is not at all persuasive . . . . There is no possible violation of fifth amendment rights since the consent to search is not 'evidence of a testimonial or communicative nature.'");  Smith v. Wainwright, 581 F.2d 1149, 1152 (5th Cir. 1978) ("[C]onsent to search is not a self-incriminating statement; '[i]t is not in itself evidence of a testimonial or communicative nature.'") (second set of brackets in original) (citation omitted);  United States v. Glenna, 878 F.2d 967, 971 (7th Cir. 1989) ("[A]lthough the district court believed that the officers' request for consent to retrieve the registration papers was 'reasonably likely to evoke an incriminating response' and therefore ran afoul of Miranda, every federal circuit court that has addressed the question has reached the opposite conclusion.");  Cody v. Solem, 755 F.2d 1323, 1330 (8th Cir. 1985) ("a consent to search is not an incriminating statement");  United States v. Lemon, 550 F.2d 467, 472 (9th Cir. 1977) ("[C]onsent to a search is not the type of incriminating statement toward which the fifth amendment is directed.");  United States v. Rodriguez-Garcia, 983 F.2d 1563, 1568 (10th Cir. 1993);  United States v. Hidalgo, 7 F.3d 1566, 1568 (11th Cir. 1993).

Burns, 33 M.J. 316 (C.M.A. 1991); United States v. Roa, 24 M.J. 297 (C.M.A. 1987).  In Burns, this Court rejected the appellant's claim that his Fifth Amendment and Article 31, UCMJ, 10 U.S.C. § 831 (2000), rights were violated by a request for consent to search after he invoked his right to counsel, holding that the argument was "plagued by a faulty premise, for it seems to ignore the significant distinctions outlined by us in Roa." 33 M.J. at 320.  The Court explained:

> [I]nterrogation is for the purpose of eliciting from a suspect communications about the matter under investigation.  However, a consent to search does not of itself communicate any information about the investigated crime; and it is not a statement regarding an offense. Therefore, requesting consent to search property in which a suspect has an interest is not prohibited by his prior request for counsel, because Edwards provides protection only as to interrogation.

Id.  (quoting Roa, 24 M.J. at 301 (Everett, C.J., concurring in the result)).  Since consent "is not a statement" and a request for consent is not an "interrogation," consent to search is "a neutral fact which has no tendency to show that the suspect is guilty of any crime" and is not in itself incriminating.  Id. (citations omitted) (internal quotation marks omitted). Therefore, the Edwards doctrine does not prevent authorities from making a search request after a suspect invokes the right to counsel.  Id.

The other federal courts also agree that a defendant's consent to search is not an incriminating response, and

therefore a request for consent is not "interrogation" and does not violate Edwards. See United States v. Knope, 655 F.3d 647, 654 (7th Cir. 2011) ("Knope's argument [that his consent to search was invalid under Edwards because he signed after invoking his right to counsel] is foreclosed, however, by this court's holding that 'a consent to search is not an interrogation within the meaning of Miranda.'"); United States v. Bustamante, 493 F.3d 879, 892 (7th Cir. 2007) ("Though all interrogation must cease once a defendant in custody has invoked his right to counsel, a request to search a vehicle or home is not likely to elicit an incriminating response and is therefore not interrogation."); United States v. Taylor, No. 99-4373, 2000 U.S. App. LEXIS 106 at *4, 2000 WL 6146 at *2 (4th Cir. Jan 6, 2000) (unpublished table decision) ("There was no Miranda violation when, after Taylor informed investigators that he was not responding to any more questions, investigators asked him to consent to a search of his financial records. Asking for and receiving consent was not part of the interrogation because giving consent is not a self-incriminating statement."); United States v. Gonzalez, 1998 U.S. App. LEXIS 14891, at *3-*4, 1998 WL 377901, at *1 ("Gonzalez' consent to search, however, is not an interrogation that triggers his previously invoked right to counsel [under Edwards]."); United States v. Shlater, 85 F.3d 1251, 1256 (7th Cir. 1996) ("Even though Shlater stated that he

11

wished to have counsel present for any interrogation regarding the specific events of the evening, the law provides that request for counsel during the interrogation does not apply to the subsequent request for a consent to search."); Tukes v. Dugger, 911 F.2d 508 (11th Cir. 1990) (denying habeas corpus claim based on consent to search obtained after defendant had invoked right to counsel); Dunn v. Pliler, 2008 U.S. Dist. LEXIS 32633, at *35-*39, 2008 WL 1701904, at *13-*15 (N.D. Cal. 2008) (consent to search was voluntary after defendant had invoked right to counsel); State v. Crannell, 750 A.2d 1002, 1009 (Vt. 2000), overruled in part on other grounds by State v. Brillon, 2008 VT 35 ¶ 41, 183 Vt. 475, 497, 955 A.2d 1108, 1123 ("The federal courts of appeal agree that a defendant's consent to search is not an incriminating response and therefore a request for consent is not "interrogation" subject to limitation by Edwards."). In United States v. Harmon, for example, the defendant invoked her right to counsel, but then made statements about what was in her work area after an officer requested her consent to search the area. 2006 U.S. Dist. LEXIS 390, at *18, 2006 WL 42083, at *6 (D. Kan. 2006). The court found that since a request to search does not amount to interrogation, the defendant voluntarily initiated the statements and they should not be suppressed. Id.

12

In the present case, when Appellant invoked his right to counsel, the NCIS agents properly terminated the interrogation. Thus, when the agents requested Appellant's consent to search and provided him with a permissive search authorization, Appellant was not subject to interrogation in the form of "express questioning or its functional equivalent." Innis, 446 U.S. at 300-01. As this Court and every federal court of appeals that has considered the issue have found, a request for consent to search does not constitute an interrogation. A defendant's consent to search is neither of a testimonial or communicative nature, nor an incriminating response, and therefore a request for consent is not "interrogation" subject to limitation by Edwards. Furthermore, a request for consent to search, even if accompanied by a reminder on a form that the accused is under investigation, is not "for the purpose of eliciting from a suspect communications about the matter under investigation." Burns, 33 M.J. at 320 (internal quotation marks and citation omitted). Therefore, even under the standard proposed by the majority, the request cannot be said to "open up a more generalized discussion relating directly or indirectly to the investigation." Bradshaw, 462 U.S. at 1045.

Rather, in asking whether "the door was still open to discuss his side of the story," Appellant himself initiated "further communication, exchanges, or conversations with the

13

police." Edwards, 451 U.S. at 484-85. The military judge's

finding on this point, based on his assessment of the witnesses'

testimony, is not clearly erroneous. Further, as a matter of

law, Appellant's inquiry "evinced a willingness and a desire for

a generalized discussion about the investigation; it was not

merely a necessary inquiry arising out of the incidents of the

custodial relationship." Bradshaw, 462 U.S. at 1045-46. That

the agents understood the question in this manner is apparent

from the fact that they immediately reminded the accused that he

had exercised his right to counsel, and did not continue

questioning until the following day after Appellant had

expressly waived his rights. See id. at 1046.

Waiver

>   Absent an Edwards violation, the question becomes:
>
>   whether a valid waiver of the right to counsel and the
>   right to silence had occurred, that is, whether the
>   purported waiver was knowing and intelligent and found
>   to be so under the totality of the circumstances,
>   including the necessary fact that the accused, not the
>   police, reopened the dialogue with the authorities.

Id. (quoting Edwards, 451 U.S. at 486 n.9); see also M.R.E.

305(g)(1) ("The waiver must be made freely, knowingly, and

intelligently."). Such assessment is based on the totality of

the circumstances, including: the condition of the accused, his

health, age, education, and intelligence; the character of the

detention, including the conditions of the questioning and

rights warning; and the manner of the interrogation, including the length of the interrogation and the use of force, threats, promises, or deceptions." United States v. Ellis, 57 M.J. 375, 379 (C.A.A.F. 2002).[5]

The record reflects that Appellant first invoked his right to counsel, immediately terminating the interrogation. Appellant spent seven days in confinement, and then reinitiated conversation. The agents did not bait him into doing so with threats, promises, or inducements, but merely asked Appellant for a permissive search authorization. Appellant then had a further night to consider his waiver. The next day, Appellant received a cleansing warning and waived his rights.

Appellant does not contest that, after communicating with the agents during the search process on the evening of May 18, he was again orally advised of his right to counsel and that reinterrogation did not commence until the following day. He further does not contest that at that time and prior to questioning he received a cleansing warning orally and in writing. Ordinarily such circumstances are persuasive indication that a statement is voluntary. However, Appellant argues that the circumstances of his custodial detention in a combat zone should alter the analysis.

---

[5] These factors go to the separate consideration of whether a valid waiver of the right to counsel and the right to silence occurred; they are not part of the Edwards determination.

I would conclude that Appellant's detention conditions and lack of access to counsel for seven days did not vitiate what was otherwise his knowing and voluntary waiver. This conclusion is based on three factors. First, civilian courts have consistently found that solitary confinement, which also creates an inherent incentive to seek release by making a statement, alone does not render a waiver of rights involuntary. Appellant has not cited contrary authority. Custodial detention in the "can" no doubt creates its own pressure and incentive to obtain release, but Appellant has not made the case that as a matter of law his detention should be treated differently for Edwards purposes than solitary confinement, where there is a subsequent knowing and voluntary waiver of rights. See, e.g., United States v. Webb, 311 F. App'x 582, 584 (4th Cir. 2009) (Webb initiated contact and knowingly and voluntarily waived his rights after being held in isolation for four days without access to counsel); United States v. Odeh (In re Terrorist Bombings of U.S. Embassies in E. Afr.), 552 F.3d 177, 214 (2d Cir. 2008) ("Taking into account the totality of the circumstances, as we must, we cannot conclude that, because Al-'Owhali was detained incommunicado for fourteen days, the statements he made after waiving his Miranda rights were involuntary."); Clark v. Solem, 693 F.2d 59, 61-62 (8th Cir. 1982) (sixty days of solitary confinement did not render plea

involuntary); United States v. Kiendra, 663 F.2d 349, 351 (1st Cir. 1981) (Nineteen year-old's solitary confinement for thirty days "cannot be presumed to have weakened his will to such an extent that he was incompetent to exercise his rights."); Brown v. United States, 356 F.2d 230, 232 (10th Cir. 1966) (placement in disciplinary segregation for several days did not render confession involuntary).

Second, while the combat context in the present case may have added to the pressure Appellant may have felt in isolation, Appellant was also aware the he was returning to the United States on an imminent basis -- in fact, the same day that Appellant made the statement. In other words, Appellant was not facing the prospect of an unknown and indeterminate period of custodial detention in the "can," the escape from which he might have concluded might only come from waiving his right to counsel and making a statement.

Finally, Appellant did not waive his rights immediately after reinitiating communication with the agents. Nor was he tricked, lured, or baited into doing so. Having opened the door to making a statement, Appellant was given the opportunity to reflect upon his decision overnight. This was not a snap decision or the product of a personality overborne.

Certainly, seven days in the "can" without access to counsel is anything but a model in light of Edwards. Generally,

17

this Court expects "assignment of counsel for representational purposes at the earliest possible moment in the process of military justice." United States v. Jackson, 5 M.J. 223, 226 (C.M.A. 1978).[6] But see Miranda, 384 U.S. at 474 ("If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation in the field is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time."). At the same time, we are not charged in this case with determining best practice, but rather with determining whether Appellant's constitutional rights as described by Edwards were violated. In the absence of a per se rule that a delay in providing counsel invalidates an otherwise knowing and voluntary waiver, I would conclude that Appellant's rights were not violated. Appellant's waiver occurred following his reinitiating communication. A substantial delay occurred before the subsequent interrogation, in which Appellant could contemplate and consider his options. And, a cleansing warning was provided in both oral and written form. Thus, for the purpose of Edwards and M.R.E. 305, Appellant's statements were voluntary and the result of a knowing waiver under the totality of the circumstances. Therefore, I would hold that the military

---

[6] While counsel must also be provided as part of the initial review, Rule for Courts-Martial (R.C.M.) 305(f), defense counsel did not raise this issue at trial.

18

judge did not abuse his discretion in denying the motion to suppress the statement, and the statement was properly admitted into evidence.

UNLAWFUL COMMAND INFLUENCE

Background

The offenses at issue in this case received national and international press attention, as did the ensuing court-martial of Appellant.  The United States Navy-Marine Corps Court of Criminal Appeals (CCA) summarized the facts of the offenses as follows:

> The appellant was assigned as squad leader for 1st Squad, 2nd Platoon, Kilo Company, 3rd Battalion, 5th Marines, assigned to Task Force Chromite, conducting counter-insurgency operations in the Hamdaniyah area of Iraq in April 2006.  In the evening hours of 25 April 2006, the appellant led a combat patrol to conduct a deliberate ambush aimed at interdicting insurgent emplacement of improvised explosive devices (IEDs).  The court-martial received testimony from several members of the squad that indicated the intended ambush mission morphed into a conspiracy to deliberately capture and kill a high value individual (HVI), believed to be a leader of the insurgency.  The witnesses gave varying testimony as to the depth of their understanding of alternative targets, such as family members of the HVI or another random military-aged Iraqi male.
>
> Considerable effort and preparation went into the execution of this conspiracy.  Tasks were accomplished by various Marines and their corpsman, including the theft of a shovel and AK-47 from an Iraqi dwelling to be used as props to manufacture a scene where it appeared that an armed insurgent was digging to emplace an IED.  Some squad members advanced to the ambush site while others captured an unknown Iraqi

19

man, bound and gagged him, and brought him to the
would-be IED emplacement.

The stage set, the squad informed higher headquarters
by radio that they had come upon an insurgent planting
an IED and received approval to engage.  The squad
opened fire, mortally wounding the man.  The appellant
approached the victim and fired multiple rifle rounds
into the man's face at point blank range.

The scene was then manipulated to appear consistent
with the insurgent/IED story.  The squad removed the
bindings from the victim's hands and feet and
positioned the victim's body with the shovel and AK-47
rifle they had stolen from local Iraqis.  To simulate
that the victim fired on the squad, the Marines fired
the AK-47 rifle into the air and collected the
discharged casings.  When questioned about the action,
the appellant, like other members of the squad, made
false official statements, describing the situation as
a legitimate ambush and a "good shoot."  The death was
brought to the appellant's battalion commander's
attention by a local sheikh and the ensuing
investigation led to the case before us.

United States v. Hutchins, No. NMCCA 200800393, 2012 CCA LEXIS

93, at *4-*6, 2012 WL 933067, at *2 (N-M. Ct. Crim. App. Mar.

20, 2012) (unpublished) (paragraph breaks added).  As cited by

Appellant, the events in Hamdaniyah were alternatively portrayed

in the media as one of the most significant war crimes cases to

emerge from the Iraq war, or as an unfortunate collateral

consequence in the fog of war.  The case drew the attention of

members of Congress, who both publicly condemned what had

occurred, as well as questioned in public and in correspondence

directed to senior defense officials the prosecution of

Appellant and other members of his squad.[7]  In 2007, Appellant was tried and convicted of conspiracy, making a false official statement, unpremeditated murder, and larceny, in violation of Articles 81, 107, 118, and 121, UCMJ, 10 U.S.C. §§ 881, 907, 918, 921 (2006).

In November 2009, while Appellant's case was pending before the CCA on direct appeal, the Secretary of the Navy (SECNAV) issued a press release and gave interviews discussing the case.[8] For example, of Appellant and his squad, the Secretary of the Navy stated:

> None of their actions lived up to the core values of the Marine Corps and the Navy . . . . This was not a "fog of war" case occurring in the heat of battle. This was carefully planned and executed, as was the cover-up. The plan was carried out exactly as it had been conceived.

---

[7] The CCA granted Appellant's request to attach documents to the record reporting from members of Congress in support of clemency.  See, e.g., Clemency Denied for Plymouth Marine Convicted of Murder in Iraq, The Patriot Ledger, Nov. 19, 2009, http://www.patriotledger.com/ourtowns/x1792901664/Clemency-denied-for-Plymouth-Marine-convicted-of-murder-in-Iraq #axzz2w11HeWPV; Mark Walker, Navy Secretary Boots Four Pendleton Troops Involved in Iraqi's Killing, North County Times, Nov. 19, 2009.

[8] On September 12, 2011, the CCA granted Hutchins's motion to attach certain documents to the record which reported the Secretary of the Navy's comments.  The CCA determined that "[t]he comments were publicly made and their content and timing are not in dispute."  2012 CCA LEXIS 93, at *6, 2012 WL 933067 at *2.  The CCA summarized the Secretary's comments as expressing "surprise and disappointment with the sentences and the prospect of continuing service for the personnel involved in this case."  2012 CCA LEXIS 93, at *6 n.1, 2012 WL 933067 at *2 n 1.

Walker, supra note 7 (quoting statement of Secretary of the Navy Ray Mabas in telephone interview). The Secretary of the Navy noted that the sentence was "commensurate" with the offense, and that Appellant had already received sufficient clemency. The Secretary of the Navy also publicly expressed "surprise" that members of the squad had been permitted to remain on active duty. In addition, the Secretary announced his decision to direct their separation from the service.

As depicted in the following table, the Secretary of the Navy's comments occurred nearly a year after the Navy Clemency and Parole Board (NC&PB) voted to recommend that Appellant's sentence be reduced. After the Secretary of the Navy's statements, the NC&PB then voted against additional clemency. Later, however, the CCA set aside the findings and sentence. The Principal Deputy Assistant Secretary for Manpower and Reserve Affairs also approved a recommendation reducing Appellant's sentence by 251 days. Hutchins, 2012 CCA LEXIS 93, at *18 n.6, 2012 WL 933067, at *7 n.6.

Table 1: Timeline[9]

| 3 Aug. 2007 | Members adjudge sentence at General Court-Martial |
|---|---|
| 15 Feb. 2008 | Staff Judge Advocate's Recommendation |
| 2 Apr. 2008 | Addendum to Staff Judge Advocate's Recommendation |
| 2 May. 2008 | CA's action granting clemency |
| 12 Jun. 2008 | Record docketed at CCA for Article 66, UCMJ, review |

---

[9] Adapted from Hutchins, 2012 CCA LEXIS 93, at *5, *18, 2012 WL 933067, at *3, *7.

| Feb. 2009 | NC&PB votes to reduce sentence to five years |
|---|---|
| 17 Nov. 2009 | SECNAV's public comments about Appellant's case |
| Jan. 2010 | NC&PB votes against clemency or parole |
| 22 Apr. 2010 | CCA issues opinion setting aside findings and sentence |
| 7 Jun. 2010 | JAG certifies case to CAAF |
| 14 Jun. 2010 | Appellant released from confinement |
| 11 Jan. 2011 | CAAF reverses the CCA decision and remanded to CCA |
| 17 Feb. 2011 | CCA redocketed case for Article 66, UCMJ, review |
| 30 Mar. 2011 | Principal Deputy Assistant Secretary approves clemency recommendation reducing sentence by 251 days |
| 20 Mar. 2012 | CCA issues opinion affirming the sentence |

Appellant contends that the Secretary of the Navy's comments to the media about his case constituted unlawful command influence, in light of their actual or apparent influence on his appellate review and clemency proceedings.

Discussion

In deciding this case based on the admission of Appellant's statement, the majority avoids a systemically important question involving unlawful command influence. This is a mistake. First, the issue of unlawful command influence was litigated throughout these proceedings. It is a central aspect of the case. As a result, Appellant's and the public's confidence in the ultimate outcome in the handling of this case rests in part on how this issue is addressed, or not addressed.

Second, this Court has referred to unlawful command influence as "the mortal enemy of military justice." United States v. Douglas, 68 M.J. 349, 355 (C.A.A.F. 2010) (internal quotation marks and citation omitted). If that is the case,

23

then the issue should warrant inquiry and consideration by the military justice system's highest, and only, civilian court. Moreover, this case raises matters of first impression involving the scope of Article 37, UCMJ, as well as the nature of a service secretary's clemency process.  To what extent, if at all, does the prohibition against unlawful command influence bar policymakers from addressing matters of national and foreign policy importance where they also involve matters of military justice and executive clemency?

## Framework of Review

The framework for addressing unlawful command influence before this Court reflects the seriousness with which the issue is considered by Congress, the President, the military, and this Court.  First, the framework is intended to promote the adjudication of the facts rather than a reliance on concepts of deference and waiver.  Thus, this Court reviews allegations of unlawful command influence de novo.  United States v. Harvey, 64 M.J. 13, 19 (C.A.A.F. 2006); United States v. Villareal, 52 M.J. 27, 30 (C.A.A.F. 1999).  Furthermore, "[w]e have never held that an issue of unlawful command influence arising during trial may be waived by a failure to object or call the matter to the trial judge's attention."  United States v. Baldwin, 54 M.J. 308, 310 n.2 (C.A.A.F. 2001).

Second, while Appellant bears the initial burden of raising unlawful command influence, the threshold of persuasion is relatively low before the burden shifts back to the Government. United States v. Biagase, 50 M.J. 143, 150 (C.A.A.F. 1999). Appellant "must show:  (1) facts, which if true, constitute unlawful command influence; (2) . . . that the proceedings were unfair; and (3) . . . that the unlawful command influence was the cause of the unfairness." United States v. Richter, 51 M.J. 213, 224 (C.A.A.F. 1999) (internal quotation marks omitted) (quoting Biagase, 50 M.J. at 150).  Prejudice is not presumed until Appellant "produces evidence of proximate causation between the acts constituting unlawful command influence and the outcome."  Biagase, 50 M.J. at 150.  Thus, the initial burden of showing potential unlawful command influence "is low, but [is] more than mere allegation or speculation." United States v. Stoneman, 57 M.J. 35, 41 (C.A.A.F. 2002).

"The quantum of evidence required to raise unlawful command influence is 'some evidence.'" Id. (quoting Biagase, 50 M.J. at 150).  Once an issue of unlawful command influence is raised by some evidence, the burden shifts to the Government to rebut an allegation of unlawful command influence by persuading the Court beyond a reasonable doubt that (1) the predicate facts do not exist; (2) the facts do not constitute unlawful command influence; (3) the unlawful command influence did not affect the

findings or sentence; or (4) if on appeal, by persuading the appellate court that the unlawful command influence had no prejudicial impact on the court-martial. Biagase, 50 M.J. at 151.

Third, the Court considers both actual and apparent unlawful command influence. United States v. Simpson, 58 M.J. 368, 374 (C.A.A.F. 2003). The appearance of unlawful command influence exists "where an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding." United States v. Lewis, 63 M.J. 405, 415 (C.A.A.F. 2006). Consideration of an issue of unlawful command influence falls short if it "'fails to take into consideration the concern of Congress and this Court in eliminating even the appearance of unlawful command influence at courts-martial.'" Stoneman, 57 M.J. at 42 (quoting United States v. Ayers, 54 M.J. 85, 94–95 (C.A.A.F. 2000).

Application of Unlawful Command Influence to Civilian Leadership

As a preliminary matter, one must consider whether Article 37, UCMJ, applies to the Secretary of the Navy. The Government argues that it does not.

Article 37(a), UCMJ, establishes the prohibition against unlawfully influencing the action of a court-martial:

> No authority convening a general, special, or summary court-martial, nor any other commanding officer, may censure, reprimand, or admonish the court or any member, military judge, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercises of its or his functions in the conduct of the proceedings. No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts.

(emphasis added). As the Secretary of the Navy does not fall within the statutory ambit of Article 2, UCMJ, 10 U.S.C. § 802 (2006), as the Government argues, there is a textual argument that Article 37, UCMJ, would not directly apply unless the Secretary of the Navy was acting as the convening authority. See Article 22, UCMJ, 10 U.S.C. § 822 (2006); Mullan v. United States, 42 Ct. Cl. 157, 162 (1907).

However, an accused has a due process right to a fair trial and appeal, free from the undue influence of superiors, whether they are military officers or civilians in policy and administrative positions. Thus, regardless of whether Article 37, UCMJ, applies to the Secretary of the Navy, unlawful influence by a civilian official may present a due process "error of constitutional dimension." See Biagase, 50 M.J. at, 149-50 (citing United States v. Thomas, 22 M.J. 388, 394 (C.M.A. 1986)). Based on these due process considerations, while this

27

Court has never explicitly stated so, it has applied an Article 37-based analysis to prohibit unlawful command influence by civilians who are in positions of authority in the military civilian hierarchy, but not subject to the UCMJ, including the Secretary of the Navy who exercises administrative command of the Department of the Navy.[10]

On the other hand, not all statements about a court-martial are necessarily "unlawful," even if addressed to the merits of the proceeding. Such a judgment will depend on a number of factors. To whom, for example, are the comments addressed? How will they be perceived by the intended audience, as well as by the larger audience, intended or not? Is the spokesperson attempting to influence the outcome of the proceeding? Is the spokesperson implicitly or explicitly threatening repercussions if his or her view is not adopted? And, whether or not the speaker intended the comments to influence the outcome or the actors in such a manner, given the nature of the comments or the nature of the speaker, should the comments be deemed to have had been made with that intent or had that effect?

---

[10] See, e.g., United States v. Allen, 20 C.M.A. 317, 43 C.M.R. 157 (1971); United States v. Estrada, 7 C.M.A. 635, 23 C.M.R. 99 (1957); United States v. Fowle, 7 C.M.A. 349, 22 C.M.R. 139 (1956); United States v. Doherty, 5 C.M.A. 287, 17 C.M.R. 287 (1954); see also 10 U.S.C. §§ 5013-14 (detailing the role of the Secretary of the Navy).

While it is tempting to be critical of officials who comment on pending cases and prudent for lawyers and judges to advise against doing so at all, there is a difference between what is safe or prudential and what is required as a matter of law or violates Article 37, UCMJ. Senior officials dealing with national security questions that also implicate military justice concerns must contemplate not only the impact of their actions on matters of military justice, but also the impact on foreign relations and national security of not commenting at all. Moreover, the good order and discipline of a military unit in combat is most assuredly a national policy matter warranting the private and public attention of senior officials as well as appropriate comment. In a system of separate and equal branches of government, senior officials must also weigh their duty to respond appropriately to inquiries from the legislative branch. Whatever the correct answer in a given context, surely that answer cannot and should not be reached without consideration of Article 37, UCMJ, and the advice of counsel. And, where a trial is ongoing or a case is on direct appeal to a military court, the ramifications of speaking and misspeaking increase.

Thus, it is through a due process lens, as well as with an appreciation of the complex responsibilities of senior officials, that I would apply the Biagase framework to determine whether Appellant established "some evidence" that the Secretary

29

of the Navy's public comments constituted unlawful command influence in relation to: (1) the decision of the CCA, (2) the Judge Advocate General's (JAG) certification, or (3) the clemency process. Because these comments occurred after Appellant's court-martial and the convening authority's action, my analysis is limited to the appellate and clemency proceedings.

United States Navy-Marine Corps Court of Criminal Appeals

Appellant alleges unlawful command influence in connection with the decision of the CCA on the ground that the Secretary's comments were made while Appellant's record was docketed at the court for review, and because the CCA judges, as officers in the Navy and Marine Corps, are subordinate to, and in theory subject to the administrative direction of, the Secretary.

On the one hand, the statements made by the Secretary were of a sort that could have influenced the CCA and done so unlawfully. The comments addressed the Secretary's specific views on the findings and sentence of the court-martial, indicating that the verdict was well founded and the sentence commensurate with the offense. In addition, the statements were publicly made and widely reported while Appellant's case was on direct review. Thus, such statements could influence judges of the CCA in both their determination to uphold the findings and

sentence as well as in the exercise of their power to determine if a sentence was appropriate.

On the other hand, there is no verbal or textual indication that the Secretary was addressing his comments to the CCA or intending to influence the outcome of Appellant's direct appeal. Nor is there indication that the Secretary intended with his comments to explicitly or implicitly threaten sanction if the judges on the CCA did not rule in a particular manner. Indeed, there is no apparent indication that the Secretary made his comments cognizant of Article 37, UCMJ, or Appellant's pending CCA appeal. That leaves the question as to whether the comments might nonetheless have had that affect given the Secretary's status as well as the visible and vehement manner in which the comments were made.

After the Secretary's comments, the CCA issued an opinion setting aside the findings and sentence, and authorizing a rehearing. United States v. Hutchins, 68 M.J. 623 (N-M. Ct. Crim. App. 2010). "In the absence of evidence to the contrary, judges of the Courts of Criminal Appeals are presumed to know the law and to follow it." United States v. Schweitzer, 68 M.J. 133, 139 (C.A.A.F. 2009) (citing United States v. Mason, 45 M.J. 483, 484 (C.A.A.F. 1997)). Without such evidence, courts will not conclude that a military judge was affected by unlawful command influence. United States v. Rivers, 49 M.J. 434, 443

31

(C.A.A.F. 1998). Clearly, such a ruling setting aside the findings and sentence does not amount to "some evidence" of actual unlawful command influence. It was only after reversal and remand from this Court that the CCA found against Appellant on each assignment of error.

Similarly, the facts do not support an appearance of unlawful command influence. An objective, disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the proceeding. See Lewis, 63 M.J. at 415. To the contrary, the actions of the CCA would validate for a member of the public that the CCA acted as a fair and impartial court independent from external command and policy influence.

On this record, Appellant has not moved beyond mere allegation or speculation in demonstrating "some evidence" that the CCA proceedings were unfair or affected by unlawful command influence.

Judge Advocate General

Appellant also alleges unlawful command influence with respect to the JAG's certification. After the Secretary's comments were made public and the CCA had set aside the findings and sentence, Appellant's case was reviewed by the JAG to assess whether an appeal to this Court should be certified under Article 67, UCMJ, 10 U.S.C. § 867 (2006). The JAG then

32

certified the case for review to this Court asking: (1) whether the CCA erred in finding that the military judge severed the attorney-client relationship; (2) whether, under R.C.M. 505(d)(2)(b), the CCA incorrectly found no "good cause" on the record for the replacement of Appellant's second detailed defense counsel; and (3) whether the lower court applied the wrong standard and erroneously presumed, without assessing, prejudice.

Appellant notes that the JAG reports to the Secretary of the Navy. See 10 U.S.C. § 5148; Dep't of the Navy, Secretary of the Navy Instr. 5430.27C, Responsibility of the [JAG] and the [SJA] to the Commandant of the Marine Corps for Supervision and Provision of Certain Legal Services (Apr. 25, 2011) [hereinafter SECNAVINST 5430.27C]. Appellant also cites media reporting that an advisor to the JAG recommended against certifying the appeal. However, even if such media reports are treated as established facts of record, differing legal opinions within the office do not alone demonstrate unfairness or unlawful influence. One would expect debate on a legal matter on which lawyers, and as it turns out, military judges, might reasonably disagree. Moreover, this Court in a unanimous opinion reversed the CCA on the question presented. Furthermore, the certified question addressing the severance of an attorney-client relationship had implications beyond this case, as shown by the cases applying

33

this Court's earlier decision reversing the lower court.  See United States v. Hohman, 70 M.J. 98 (C.A.A.F. 2011); Wuterich v. United States, No. NMCCA 200800183, 2011 CCA LEXIS 148, at *2, 2011 WL 3726640, at *1 (N-M. Ct. Crim. App. Aug. 25, 2011) (unpublished); United States v. Hancock, No. NMCCA 201000400, 2011 CCA LEXIS 114, at *2, 2011 WL 2557622, at *1 (N-M. Ct. Crim. App. June 28, 2011).  The Secretary's comments were of a sort that might have influenced a subordinate officer unaware or uncommitted to Article 37, UCMJ.  But there is no evidence they did and there were valid reasons to certify the case, and no showing that invalid reasons influenced the decision.

Ultimately, subordination, a divergence of staff advice, and a certification do not alone amount to some evidence of unlawful command influence.  Rather, they reflect the ordinary process of review and appeal.

Clemency Process

Finally, Appellant argues that the Secretary's statements unlawfully influenced the process of the NC&PB.  As noted above, the NC&PB initially voted to recommend five years of clemency, in addition to the four years of clemency Appellant had received from the convening authority.[11]  Nearly a year later, the

---

[11] We also note that, although not part of the record, as publicly reported and repeatedly stated in Appellant's briefs, the Assistant Secretary of the Navy rejected the NC&PB's clemency recommendation on March 10, 2009, eight months before

34

Secretary made his public comments about the case. Two months after the Secretary's comments, the NC&PB voted against recommending the five years of clemency it had earlier considered. In 2011, the Principal Deputy Assistant Secretary approved a clemency recommendation reducing Appellant's sentence by 251 days.

The Government argues that the Secretary of the Navy cannot unlawfully influence the NC&PB's clemency process because the Secretary retains the final determination to award clemency. Under the system established by the Secretary, the NC&PB acts for or provides recommendations or advice to the Secretary on clemency or parole matters. Dep't of the Navy, Secretary of the Navy Instr. 5815.3J, Dep't of the Navy Clemency and Parole Systems para. 306 (June 12, 2003) [hereinafter SECNAVINST 5815.3J]. However, the Secretary of the Navy retains statutory authority over clemency decisions. Article 74, UCMJ, 10 U.S.C. § 874 (2006).[12] Moreover, in the context of Appellant's case,

---

the Secretary's comments. See, e.g., Rich Harbert, Navy Panel Considers Clemency for Lawrence Hutchins III, Wicked Local Plymouth, (Mar. 18, 2011), http://wickedlocal.com/plymouth/news/x1161119945/Navy-panel-considers-clemency-for-Lawrence-Hutchins-III#axzz2WmlcuGZI; Tony Perry, Marine Convicted of Murder Has a Job Waiting, Parole Board Is Told, L.A. Times, Jan. 7, 2010, http://articles.latimes.com/2010/jan/07/local/la-me-marine7-2010jan07.

[12] The delegation of authority to the Assistant Secretary of the Navy for Manpower and Reserve Affairs is an ordinary delegation

the Secretary not only retained general authority over clemency, but specifically reserved the opportunity to make the decision himself through regulatory exception. The NC&PB submits to the Secretary, with recommendations, cases such as "[a]ny individual whose clemency may be the subject of controversy or substantial congressional or press interest as determined by SECNAV or a designee" or cases in which the NC&PB recommends clemency and the approved, unsuspended sentence to confinement is in excess of ten years. SECNAVINST 5815.3J para. 308(a)(6)(d)-(e) (emphasis removed). The Secretary of the Navy has delegated the authority to act in matters of clemency and parole to the Assistant Secretary of the Navy for Manpower and Reserve Affairs, except in cases involving the death penalty, life without parole, and national security. Id. para. 205; Dep't of the Navy, Secretary of the Navy Instr. 5430.7Q, Assignment of Responsibilities and Authorities in the Office of the Secretary of the Navy para. 7(b)(3)(f)(2) (Aug. 17, 2009).

---

by the Secretary of the Navy to a subordinate officer within the executive branch, and does not require the Secretary of the Navy to amend or revoke the instruction to exercise his statutory authority. See United States v. Nixon, 418 U.S. 683, 696, 694 (1974) (holding that, unlike an "ordinary delegation . . . to a subordinate officer," the Attorney General's delegation was "with unique authority and tenure." As long as the regulation remained in effect, the authority was the Special Prosecutor's to exercise, not the Attorney General's.). Here, the Secretary did not deny himself the authority to act.

The Government further argues that clemency is inherently discretionary and executive in nature, and is not subject to review on due process grounds. Clemency is a "highly discretionary" power vested in the executive, United States v. Travis, 66 M.J. 301, 303 (C.A.A.F. 2008), which, as a general matter, "has not traditionally 'been the business of courts.'" Ohio Adult Parole Auth. v. Woodard, 523 U.S. 272, 284 (1998) (quoting Conn. Bd. of Pardons v. Dumschat, 452 U.S. 458, 464 (1981)).[13] The Secretary's instructions provide that clemency "is not a right, but a discretionary decision of the NC&PB or SECNAV." SECNAVINST 5815.3J para. 308(a) (emphasis omitted).

---

[13] See also Travis, 66 M.J. at 303 ("We cannot and do not substitute our judgment about the merit of a request for clemency or the weight to be given any specific clemency recommendation by a convening authority."); United States v. Healy, 26 M.J. 394, 395-96 (C.M.A. 1988) (While the courts determine sentence appropriateness, "[t]he responsibility for clemency, however, was placed by Congress in other hands."); United States v. Darville, 5 M.J. 1, 2 (C.M.A. 1978) ("Congress has continued the previous pattern of limiting the power of suspension to The President, to the Secretary of the Department, and the convening authority, who may order the sentence executed."); United States v. Cavallaro, 3 C.M.A. 653, 655, 14 C.M.R. 71 (1954) ("Congress has seen fit to grant to certain reviewing authorities the right to commute or suspend the execution of a sentence, but it did not extend that authority to boards of review."); Courts-Martial -- Pay Status of Enlisted Men in Naval Service -- Duty of Comptroller Gen., 34 Op. Atty. Gen. 162, 165-66 (1924) (When the Secretary of the Navy makes a clemency determination, "the question of whether you have exercised your discretion wisely or erroneously is not subject to review by others, but your action is conclusive, and the matter has become res ajudicata.").

A couple of break points emerge with respect to this third allegation of unlawful command influence.  First, the Secretary of the Navy's authority to commute, remit, or suspend all or part of a sentence is found in Articles 71 and 74, UCMJ, as well as in 10 U.S.C. § 953 (2006).  In the present case, the record is not clear whether the exercise or failure to exercise clemency in this case occurred pursuant to Article 74, UCMJ, and thus was part of the military justice process, or solely pursuant to 10 U.S.C. § 953.  While it is not clear whether the Secretary's clemency process at issue in this case was conducted pursuant to Article 74, UCMJ, 10 U.S.C. § 953, or both, it is clear that the clemency process authorized pursuant to Article 60, UCMJ, 10 U.S.C. § 860 (2006), was complete at the time the Secretary made his comments.

 Second, with respect to convening authorities, this Court has held that the clemency process must comply with the "essence of post-trial practice [which] is basic fair play -- notice and an opportunity to respond." United States v. Lowe, 58 M.J. 261, 263 (C.A.A.F. 2003) (internal quotation marks and citations omitted).  However, federal civilian courts have concluded that the application of the due process clause only ensures that an accused receive the clemency procedures explicitly set forth by statute, and that the procedure followed in rendering the clemency decision will not be wholly arbitrary, capricious, or

based upon whim, for example, by flipping a coin.  Duvall v. Keating, 162 F.3d 1058 (10th Cir. 1998); see also Noel v. Norris, 336 F.3d 648 (8th Cir. 2003) (if a state actively interferes with a prisoner's access to the system that it has established for considering clemency petitions, due process is violated).  Thus, absent a statutory or constitutional provision to the contrary, due process does not include the right of an accused seeking clemency to have the request reviewed by a decision maker or an executive possessing the level of impartiality normally required of a judge presiding over an adjudicatory proceeding.[14]  This is true of the convening authority acting under Article 60, UCMJ, 10 U.S.C. § 860 (2006).

---

[14] See Perry v. Brownlee, 122 F.3d 20 (8th Cir. 1997) (applying Arkansas law) (petitioner does not have right under Equal Protection Clause to unbiased decision maker under Arkansas executive clemency statute); Joubert v. Neb. Bd. of Pardons, 87 F.3d 966 (8th Cir. 1996) (applying Nebraska law) (pardons board members' alleged predisposition to deny inmate's application for commutation of death sentence, based on members' statements to media, did not preclude finding that members adequately considered application in accordance with statute); Otey v. Stenberg, 34 F.3d 635 (8th Cir. 1994) (inmate under sentence of death had no constitutionally protectable interest in clemency that could be implicated by fact that Nebraska Attorney General, who had prosecuted defendant, sat on clemency board or by fact that two assistant attorneys general appeared in opposition to commutation); Bacon v. Lee, 549 S.E.2d 840 (N.C. 2001) (allowing the governor, who served as attorney general throughout part or all of death row inmate's appellate and post-conviction review proceedings, to consider the inmate's clemency request did not violate due process, despite the governor's alleged "actual bias" or "inherent conflict of interest").

And it is true of the Secretary of the Navy acting pursuant to Article 74, UCMJ.

Third, in my view, the Secretary of the Navy would be hard pressed to exercise unlawful command influence over the NC&PB clemency decision over which he retains sole discretion with the sort of public comments attributed to him in this case. However, the exercise of sole discretion does not permit the exercise of indiscretion. The Secretary is not free to act in a manner that is arbitrary and capricious or that runs afoul of constitutional principle, such as those pertaining to the equal protection of the law.

Fourth, and more relevant for the purposes of this case, the fact that the Secretary's comments were addressed to his clemency process does not remove the matter from the jurisdictional purview of this Court; not while direct review is pending. That is because a clemency decision taken by the Secretary pursuant to Article 74, UCMJ, necessarily impacts the sentence that is reviewed by the CCA not only to assure that it is correct in law and fact, but also to determine whether it is an appropriate sentence. In short, an unlawfully influenced clemency decision under Article 74, UCMJ, might well directly influence the substance of direct appellate review by changing the sentence reviewed by the CCA and indirectly so by

influencing the views of CCA judges as to whether a sentence was appropriate. But that allegation was already addressed.

The problem for Appellant with respect to this allegation of unlawful command influence is that, as previously discussed, he has not shown "some evidence" that the Secretary's comments influenced or appeared to influence, let alone unlawfully influenced the CCA, which overturned the findings and sentence, or the Judge Advocate General's decision to certify the case to this Court. With respect to the Secretary's NC&PB clemency process, exercised during direct review, the Appellant has not produced "some evidence" that the Secretary acted in a manner that was contrary to regulation, arbitrary and capricious, in violation of constitutional principle, or that unlawfully influenced a member of the NC&PB. The record also does not support apparent unlawful command influence. A disinterested observer, fully informed of all the facts and circumstances, would not harbor a significant doubt about the fairness of the proceeding. See Lewis, 63 M.J. at 415. This is especially so given the independent nature of the CCA's review as well as the subsequent independent review by this civilian Court.

For the reasons stated above, I must respectfully dissent.

41